(163 App. Div. 245)

## STUBBS v. CITY OF ROCHESTER.  (No. 236–9.)

(Supreme Court, Appellate Division, Fourth Department.   July 7, 1914.)

1. WATERS AND WATER COURSES (§ 209*)—MUNICIPAL WATER SUPPLY—NEGLI-
GENCE CAUSING SICKNESS—QUESTION FOR JURY.

   Where the evidence, in an action for damages from a disease contracted
   from the defendant city's domestic water supply, showed that the im-
   purity of the water was due to the letting in of river water through the
   opening of a check valve by persons unknown, and that for several weeks
   frequent complaints had been made of the water, the questions whether
   the city should have inspected the pipes from time to time to discover
   whether the check valve was in place, and whether it should have used
   more diligence following the complaints to discover the source of the
   trouble, were for the jury.

   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
   § 302;  Dec. Dig. § 209.*]

2. WATERS AND WATER COURSES (§ 209*)—MUNICIPAL WATER SUPPLY—NEG-
LIGENCE CAUSING SICKNESS — PROXIMATE CAUSE — SUFFICIENCY OF EVI-
DENCE.

   Evidence, in an action for damages from typhoid fever contracted from
   the defendant city's water supply, alleged to have been contaminated with
   sewage through defendant's negligence, *held* insufficient to show that
   plaintiff's infection came from the contaminated water, where it left the
   matter one of mere conjecture rather than of necessary or probable in-
   ference from established facts.

   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
   § 302;  Dec. Dig. § 209.*]

Appeal from Trial Term, Monroe County.

Action by Thomas E. Stubbs against the City of Rochester.  From
an order denying motion to set aside verdict and for new trial, defend-
ant appeals.   Reversed, and motion to set aside verdict and for new
trial granted.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT,
and MERRELL, JJ.

William W. Webb, of Rochester (John M. Stull, of Rochester, of
counsel), for appellant.

John Van Voorhis & Sons, of Rochester (Charles Van Voorhis, of
Rochester, of counsel), for respondent.

FOOTE, J.   On the 6th day of September, 1910, plaintiff became
so ill as to be confined to his bed with a disease soon diagnosed to be
typhoid fever.   He had been ailing for about one week before.   His
illness ran the usual course of that disease, and he recovered in about
six weeks.   He has recovered a verdict on the theory that he con-
tracted the disease from the defendant city's domestic water supply
of which he drank daily at his place of employment, and that it had
become polluted with sewage containing the particular germ or bacillus
which produces that disease through the negligence of the employés
of the city having charge of the system.   The city has two systems of
waterworks, one for potable water, which comes from Hemlock Lake
to reservoirs near the city, and is thence distributed by gravity to the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

dwellings and offices of the inhabitants, and the other, for protection against fires in the business district by means of water pumped from the Genesee river near the center of the city into a separate set of distributing pipes. This is called the "Holly System," and the former, the "Hemlock System." In 1881 a lift bridge was constructed over the Erie Canal at Brown street designed to be operated by hydraulic power; and, as the city was to furnish this power, it made a connection from both the Holly and Hemlock pipes in that street, with the pipe leading to the piston by which the bridge was raised. The hydraulic power from either system was alone sufficient to operate the bridge, and it was intended at that time to use only the power from the Holly pipe, but a connection with the Hemlock System was deemed necessary, or at least advisable, to insure power at times when the Holly pumps might be disabled. Gates were installed in each pipe at a convenient point back from its place of connection with the piston pipe, which admit the water of both systems into the piston pipe at the same time, or, one being closed, would admit only the water of the other system. The city's employés had possession of the wrenches by which these gates could be opened or closed. A device was also installed in the Hemlock pipe intended to prevent the Holly water from getting into that pipe as it otherwise would when the gates in both were open, because the pressure maintained in the pipes of the Holly System was somewhat greater than in the Hemlock. This greater pressure of the Holly water would overcome the smaller pressure of the Hemlock water at the point of the wye where the two pipes come together to enter the piston pipe and set the Hemlock water back in its own pipe to a point where the pressure upon the two systems became equal.

The device installed to prevent this result consisted of an iron check valve or door hung in the Hemlock pipe at a point between the gate and the piston pipe, and so placed that when the pressure of the water is toward the piston pipe, it will swing open and let the water pass freely, but when the stronger pressure is in the opposite direction, it closes and remains closed so long as the pressure on that side is greatest, and when so closed it prevents the Holly water from flowing into the Hemlock pipes. This check valve performed its office, so far as appears, successfully from its installation in 1882 until the spring of 1910 when (as was afterwards discovered) it was removed without the knowledge of the city authorities by some unauthorized persons, but by whom is not known. It is suggested that the only persons having a motive to do it were the employés of the state in charge of the operation of this bridge who at times complained of insufficient pressure in the pipes to raise the bridge. These complaints, however, were in previous years, and the trial court ruled that there was no evidence that the valve had been removed earlier than the spring of 1910. Just prior to the opening of canal navigation in that year employés of the city opened the gates in the Hemlock pipe at this bridge which had been closed throughout the winter. They claim not to have opened the gate in the Holly pipe. Nevertheless, on October 6th, it was found that both the Holly and Hemlock gates were open, and it is plaintiff's contention, based on the impure condition of the domestic water in

that section of the city, that the gates in both sets of pipes had been open throughout that summer with no check valve in the Hemlock pipe, and that thus the water furnished by the city to about 50,000 of its inhabitants in that section for domestic use was mingled with and contaminated by the Holly water pumped from the Genesee River. Some of the sewers of five villages discharge into this river at points from 12 to 30 miles above the city. No city sewers discharge into the river above the pumping station, except two or three storm-water overflows which are designed to discharge storm water only.

Numerous complaints of the water were received by the waterworks department from inhabitants in the vicinity of Brown Street Bridge, beginning in the latter part of June and continuing until the source of the trouble was discovered in October. These complaints were more frequent than usual. They were responded to by the department in the usual way for removing roily water from the pipes by opening the street hydrants to flush the pipes. This furnished temporary relief only. Finally, in the latter part of September, a complaint made to the health department resulted in the discovery that river water was apparently entering the domestic pipes, and in about 48 hours after such discovery the place of such entry at the Brown Street Bridge was located and the Holly gate closed. There were four or five other canal bridges where the waters of the two systems were brought together at the motors of the bridges in the same manner and by like construction as at Brown street, and no similar trouble had occurred at these bridges.

[1] Two grounds of negligence of the city were left to the jury by the trial court: First, whether it should have inspected the pipes from time to time to discover whether the check valve was in place; and, second, whether it should have used more diligence following the complaints of bad water to discover the nature and source of the trouble. These, we think, were fair questions of fact, and properly left to the jury. By the verdict it has been found that the city was negligent in one or both respects.

[2] We do not stop to consider whether the verdict in this respect is against the weight of the evidence, as is contended on behalf of the defendant, in view of our conclusion as to another question which controls our decision. That question is whether the evidence permits the further finding of the jury which is in effect that but for the city's negligence plaintiff would not have had typhoid fever in the fall of 1910. The proof is that this is a germ disease, and is contracted only by taking the typhoid bacillus into the stomach. There was no proof of the presence of this typhoid bacillus in the river water, or of the existence of cases of typhoid fever, during the summer of 1910 in any of the villages whose sewers drain into the river, nor was there any proof that sewage commonly carries typhoid bacillus where no excreta from persons suffering with that disease is in the sewage. The statistics as to typhoid in the city of Rochester from 1901 to 1910 were given in evidence, from which it appeared that the disease was more or less prevalent every year, the number fluctuating between 91 cases in 1909 and 173 cases in 1907, and showing an average for the years 1901 to

1909, inclusive, of 135 cases per year. These were scattered throughout the city, and no section of the city was free from it. In the year 1910 there were 223 cases, which was 50 more than occurred in 1907, when there was no known cause for an increase beyond the normal. The region specially affected by the contaminated water in the summer of 1910 has a population of about 50,000, which is nearly one-fourth of the population of the city; hence, in this region, 34 cases of typhoid may be expected each year according to the average number for the nine years previous to 1910, or 43 cases according to the experience of 1907. It does not clearly appear from the evidence as to how many of the additional cases in 1910 were located in the section of the city where the water was contaminated, though it may be that a close scrutiny of the exhibits in evidence will determine that number to be 20, as is stated in the brief of defendant's counsel. But assuming it to be about that number, we have, say, 63 cases of typhoid in the affected region in 1910. According to the experience of the nine previous years, 34 of these cases were due to causes other than river water, taking the average of such cases for those years, or 23 were due to other causes according to the experience of 1909 and 43 according to the experience of the two previous years. These figures are, of course, approximate, and based on the assumption that about one-fourth of the number of cases in the whole city occurred in this affected region. The figures are, however, sufficiently accurate to illustrate the question we have for consideration, which is: Assuming that a large percentage of the typhoid cases in the city at large, or in the affected region, in 1910 were due to other causes than river water and would have occurred, according to past experience, if there had been no contamination of the domestic water with river water, does the evidence authorize or support an inference that plaintiff's typhoid was caused by drinking the contaminated water? If it does, then we see no sufficient basis for distinguishing this case from that of all the other typhoid cases in that region that year, for the water supply of the region was the same, and there was no other.

It is true that plaintiff's evidence does eliminate in his case some of the known modes by which the typhoid bacillus is taken into the human stomach, as, for instance, he was not out of the city during that summer, he did not eat oysters or other shell fish, but he was subject to several other known modes of infection. He did not reside in the infected region, but drank the water in the shop where he worked, and was one of 40 employés using the same water from the same tap, and it does not appear that any of the others contracted the disease, which indicates that if the river water did, in fact, contain typhoid germs, they must have been relatively few in number. That the river water was, in many ways, polluted and unfit and even dangerous to use as drinking water is not decisive of the question, for plaintiff does not claim to have received any harm from the water unless he received from it typhoid bacilli.

The jury were asked to infer that the water did contain such bacilli, and that they came from sewage discharged into the river. Then they were asked to make a second inference from the first, that the bacilli

which caused plaintiff's illness came from this river water. According to past experience, it was almost as probable that it came from other sources, which seem to be constant and regular in the production of this disease. Nor were the jury materially aided in the decision of this question by the opinion of the plaintiff's medical experts. The hypothetical questions upon which these opinions were founded stated the fact of the pollution of the river water by sewage of the villages up the valley and the increase in the number of typhoid cases in the city at large for that year over the record of previous years, but did not exclude all other known causes of infection. If we assume the opinion of these experts to be of value upon the question of the increased number of cases in that year being attributable to contaminated water, still it goes no further than to show that such contaminated water is a possible source of plaintiff's infection, but it is also possible that plaintiff's infection came from other sources, which we are bound to assume were as operative as in former years. Whether plaintiff's infection came from contaminated water or from some of the other existing sources is, we think, upon this evidence, a matter of conjecture and speculation rather than of necessary or even probable inference from established facts, and if it may be assumed without proof that the river water carried typhoid germs, we think it does not appear from the evidence that all the typhoid cases occurring in the affected region in the summer and fall of 1910 received their infection from that water, and that hence there are two classes of such cases, one deriving their infection from the river, and the other from other sources. All are not entitled to recover against the city on account of its negligence, but only such as produce sufficient evidence to show that their case belongs to the first class. The law does not permit all to recover because of the difficulty of determining to which class a given case belongs, nor does it permit a jury to determine to which class a given case is to be assigned by mere conjecture or speculation, where the facts proved do not afford a basis for a reasonable inference one way or the other.

We are therefore of opinion that defendant's motion for a nonsuit should have been granted.

The order appealed from is reversed, with costs to the appellant to abide the event, and the motion to set aside the verdict and for a new trial is granted. All concur.

