DENNIS P. HEALY, as Administrator, etc., of JULIA C. HEALY, Deceased, Respondent, *v.* HALLENBECK-HUNGERFORD REALTY COMPANY, Appellant.

First Department, March 7, 1919.

Negligence — liability of owner of factory building for death of employee of tenant from typhoid fever alleged to have been contracted from drinking polluted well water — evidence — circumstantial evidence — erroneous instruction to jury as to presence of typhoid germs.

In an action to recover damages for the death of plaintiff's intestate alleged to have been caused by the negligence of the defendant, an owner of a factory building, in supplying for use in its building by its tenants and their employees, polluted water drawn from an artesian well sunk under the building without the knowledge or consent of the city, from which water it is claimed plaintiff's intestate contracted typhoid fever resulting in her death, it appeared that the plaintiff's intestate was an employee of a tenant of the defendant; that the defendant maintained a large water tank on the roof of the building, into the main portion of which either city water or well water or both could be pumped, but across one end of which a partition had been constructed, which portion of the tank was reserved for city water only, to be used for drinking purposes. It was claimed that the water which the plaintiff's intestate drank was commingled well and city water and the only way in which it could have been commingled was by overflow from the large tank into the small one. Although the usual period of incubation of typhoid germs is from ten to twenty-one days, the plaintiff's intestate developed the symptoms more than two months after the use of well water in the building for any purpose had been

discontinued. Her sister, who had also worked for the same employer, became ill at about the same time and died of typhoid on the same day, and a third sister, who did not work in the defendant's building, was subsequently taken sick with typhoid. Plaintiff's intestate and another sister were in the habit of swimming at least twice a month where the water might have contained germs, and the family bought a part of their milk from a store where it was kept in a tin can and ladled out to customers, and also bought vegetables at various places in the neighborhood. There was no evidence that the well water contained typhoid germs, and of the 1,500 employees in the building using the water not another case of typhoid was shown. There was an extensive epidemic of typhoid in the city during the time in question but not a single case was traced to drinking water.

Evidence examined, and *held*, insufficient to establish that plaintiff's intestate contracted typhoid fever from the well water furnished by the defendant.

A finding that the city and well water were commingled in the tank was against the weight of the evidence.

It was error for the court to refuse to charge the jury that they must find as a fact that there were typhoid bacilli in the water which the intestate drank and to charge instead that the presence of typhoid germs in the water might be inferred from the presence of bacillus coli, and that the question of fact was " whether the plaintiff or defendant is entitled to recover."

Although the cause of typhoid fever may be shown by circumstantial evidence, the conclusion must be the only one that can fairly and reasonably be drawn from the facts.

APPEAL by the defendant, Hallenbeck-Hungerford Realty Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 20th day of March, 1918, as amended under date of March 25, 1918.

The judgment was entered upon the verdict of a jury. An appeal is also taken from an order entered in said clerk's office on the 26th day of March, 1918, denying defendant's motion for a new trial made upon the minutes.

*George F. Hickey* of counsel [*Samuel Crook* and *Alfred M. Bailey* with him on the brief; *Dayton & Bailey*, attorneys], for the appellant.

*John R. Jones*, for the respondent.

SHEARN, J.:

Appeal from a judgment entered on a verdict for $5,000 damages in an action brought to recover damages for the

death of plaintiff's intestate, Julia C. Healy, alleged to have been caused by the negligence of the defendant in supplying, for use in its building by its tenants and their employees, water which was polluted, drawn from an artesian well sunk under the building, without the knowledge or consent of the city, from which water it is claimed plaintiff's intestate contracted typhoid fever, as a result of which she died.

The defendant owned a large fifteen-story factory building, No. 80 Lafayette street, in which some 1,500 employees worked for various tenants. Plaintiff's intestate was an employee of the Lupton Press which occupied the twelfth floor. The building was a new one. In the course of its construction, the building was provided with two different systems of water supply; one was the regular city water, the other came from an artesian well sunk under the building. The defendant went into possession on December 19, 1914, and used city water up to May 20, 1915. On that date the artesian water well system was put into operation, but without a permit from the board of health. There was a large water tank on the roof twenty feet long, sixteen feet wide and eight feet deep. There was a steel partition across one end extending from the bottom of the tank, slightly *above* the other walls of the tank, as testified to by the architect, but slightly *below* the other walls, as testified to by the plaintiff's witness Nils Johnson, an oiler at one time employed in the basement of the building. This small part of the tank was two feet by eight feet by fifteen feet. The only pipe entering the smaller section of the tank was a Croton water pipe. Into the main portion of the tank either Croton water or well water or both could be pumped. The water in the big tank was for washing and toilet purposes throughout the building, and in the smaller tank was for drinking purposes. The water led from the tank to the various floors where there were faucets. Over each faucet of the drinking water pipes was a sign or inscription reading " drinking water." On the floor of the Lupton Press the employees obtained their drinking water from an ordinary sanitary water bottle, which was filled by a porter from one of the drinking water faucets. It is not pretended that the intestate drank water from any of the washing water faucets, but it is claimed that the water

in the bottle out of which she drank was commingled well and Croton water. The only way in which the Croton and well water could possibly become commingled was by overflow from the large tank into the small one, and this could only happen in the event that an automatic vent to take care of overflow and let it out on the roof did not work. Although it is difficult to believe that the tank would have been constructed under scientific supervision with a partition lower than the sides, so as to permit the washing water from the big tank to overflow into the drinking water tank, and although the testimony of the architect shows that the tank was not so constructed, a question was presented for the jury by the testimony of the oiler Johnson, who appears to have spent considerable time on the roof, although employed in the basement, and who testified that the partition was actually lower than the sides and that he had actually seen the washing water flow over into the drinking water tank. This witness is one who had made for the defendant a written and sworn statement directly contrary to his testimony, but who gave the usual explanation, saying that he did not read it. Taken in connection with overwhelming testimony showing when the pumping of well water was discontinued, we are of the opinion that the finding that the Croton and well waters were commingled in the tank is palpably against the weight of the evidence. But for the purposes of the case we shall for the moment assume that the jury was warranted in finding that the waters were actually commingled.

It appears that on May 29, 1915, Mr. McGill, sanitary inspector of the department of health, went to the building and found well water being used and told the defendant that it was necessary to have a permit. Application for a permit was then signed. On June first the inspector took a sample of the well water and delivered it to one of the departments of the board of health. On June eighth the inspector returned to the building and ordered that the use of the well water for any purpose in the building be discontinued. The weight of the evidence is to the effect that after that date no well water was pumped in the building, although Johnson testified, contrary to his written statement, that well water was pumped for two or three months thereafter. The importance of this

lies in the fact that the usual period of incubation of typhoid germs in the human system is from ten to twenty-one days, and plaintiff's intestate developed the symptoms on August twenty-third.

The test of the well water was made in the board of health by Miss Noble, a bacteriologist there employed. She found that it contained bacillus coli, twenty coli per cubic centimeter, and said that this rendered the water " suspicious," by which she meant that it might contain injurious organisms. She found no typhoid bacillus, and tested for none, for it appears that it is extremely difficult to isolate typhoid bacillus in water and that the department of health has never succeeded in doing so.

Plaintiff's intestate left the Lupton Press on August fifteenth. She developed symptoms of illness at home, and on August 23, 1915, her illness was correctly diagnosed as typhoid fever. The intestate had a sister, Mary, who also worked for the Lupton Press up to July twenty-ninth, when she stopped to assist her mother. Mary became ill at about the same time that Julia did and was taken to the hospital two days after Julia was taken. Both of them died of typhoid in the hospital on the same day. A third sister, Catherine, who, however, did not work in the defendant's building, was taken sick with typhoid on September sixth.

Plaintiff's intestate and another sister, Margaret, were in the habit of going to Coney Island frequently and they swam there at least twice a month. The intestate's family bought a part of their milk for domestic purposes at a Brooklyn grocery store where the milk was kept under the grocery counter in a tin can, from which it was ladled out to customers. Intestate's family bought vegetables at various places in their neighborhood. It appears that one of the most common sources of typhoid is milk. It is also caused by using vegetables which are not kept clean and on which flies alight after coming into contact with excrement and filth. It is also caused by taking water into the mouth while swimming if the water is polluted with garbage. There was an extensive epidemic of typhoid in the city of New York and especially in Brooklyn and Staten Island in the summer of 1915 and a determined effort to get at the causes was made

in each case.   Numerous cases were attributed to several of the foregoing causes and not a single case was traced to drinking water.   Of all the 1,500 employees in this building using this water not another case of typhoid was shown.   One girl became sick and had some of the symptoms common in typhoid fever, but there was no evidence that she had typhoid although she was treated by the intestate's doctor, who was a witness.   Upon this state of facts, with numerous, common, possible causes for typhoid other than drinking the water in defendant's building, and without any evidence whatever of the presence of any typhoid germs in the water furnished in defendant's building, the jury was permitted to speculate and conclude that as there may have been typhoid germs in the water, these germs brought on intestate's attack of fever. The only possible basis for this was a hesitating opinion, given by an expert, that, under all the facts of the case assumed in a hypothetical question, intestate's attack of typhoid fever had for a competent producing cause the drinking water in defendant's building.   But if this opinion was a mere guess, it is worthless as a basis for a finding of fact.   It is perfectly obvious that it was a mere guess so long as there was no proof in the case of there being any typhoid germs in the water.   The method of reasoning was, that when typhoid germs are found they are usually accompanied by bacillus coli; that bacillus coli germs were found in this water; and, therefore, by some process of reasoning, which I do not follow, the water contained typhoid germs.   This too in spite of the fact that practically all drinking water contains some bacillus coli.   It is apparent that the verdict is based upon mere guesswork and speculation.

It is quite true that the cause of the typhoid might be shown by circumstantial evidence, as may any other fact, but, as pointed out by the Court of Appeals in *Scharff* v. *Jackson* (216 N. Y. 598, 602), in such case the conclusion must be the only one that can fairly and reasonably be drawn from the facts.   It is quite as reasonable to draw from the facts in this case the conclusion that the cause of the typhoid was germs coming from sea water which may have been polluted, or from improperly protected milk, or from vegetables, as to

infer that it came from drinking water which was not shown to have contained any typhoid germs.   A recent and interesting case in point is *Stubbs* v. *City of Rochester* (163 App. Div. 245) where the Fourth Department reversed a judgment, recovered by the plaintiff on the theory that he contracted typhoid fever from the city's water supply, which was polluted from sewage discharged into the river from which water was taken for fire purposes, which water through the negligence of the city got into the pipes through which the people were served with drinking water.   There was plenty of proof in the case that the pollution was such that one might expect to find typhoid bacilli, but there was no proof that the water did contain these germs.   As said by the court:   " The jury were asked to infer that the water did contain such bacilli and that they came from sewage discharged into the river. Then they were asked to make a second inference from the first, that the bacilli which caused plaintiff's illness came from this river water.   * * *   Whether plaintiff's infection came from contaminated water or from some of the other existing sources is, we think, upon this evidence, a matter of conjecture and speculation."   (See, also, the similar case of *City of Duncan* v. *Tidwell*, 48 Okla. 382; 150 Pac. Rep. 112.) Accordingly, apart from the other links in the chain of evidence, as to which the finding was against the weight of the evidence, and apart from the clear error of the court in refusing to charge the jury that they must find as a fact that there were typhoid bacilli in the water which intestate drank, but instead charging the jury that the presence of typhoid germs in the water might be inferred from the presence of bacillus coli, and that the question of fact was " whether the plaintiff should recover a verdict or whether the defendant should recover a verdict," this verdict is based purely upon speculation and cannot stand.

The judgment and order should be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., DOWLING, SMITH and PAGE, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.