WILLIAM D. HAMILTON *vs.* MADISON WATER COMPANY.

Somerset.    Opinion May 7, 1917.

*Nature of action against water company on account of furnishing impure water.*
*Rule as to burden of proof in such actions.    Negligence of water*
*company.    Degree of care required of water company.*
*Contributory negligence on part of plaintiff.*

In an action on the case to recover damages sustained by the plaintiff by reason of the defendant's alleged negligence in furnishing him with water from which he contracted typhoid fever,

*Held:*

1.   That it was the duty of the defendant to exercise ordinary care and vigilance in furnishing and distributing at all times an adequate supply of wholesome water for domestic use.

2.   That the degree of care and vigilance necessary to constitute ordinary prudence has relation to the importance of the subject matter and is commensurate with the duty to be performed.

3.   When a corporation assumes what is practically an exclusive right to provide a community with such a prime necessity of life as water, sound public policy requires that it be held to a high degree of faithfulness in furnishing a supply adequate in quantity and wholesome in quality.    This is but the exercise of ordinary care applied to the circumstances of the particular case.

4.   Actual notice or knowledge of the unwholesomeness of the water on the part of the defendant is not an essential element to be proven in order to establish the defendant's liability.    It is sufficient if there was credible testimony showing that the defendant in the exercise of reasonable care might have discovered its unwholesome and dangerous condition.

5.   Nor is the plaintiff legally required to prove by positive testimony and with absolute certainty that the drinking of the water was the cause of his typhoid fever.    It is sufficient if he proves facts and circumstances from which it is made to reasonably appear that the drinking of the water was the probable efficient cause of his illness.

6.   The facts and circumstances in this case lead to the reasonable conclusion that the typhoid fever from which the plaintiff suffered was contracted from the use of the water furnished by the defendant, and that the defendant was not in the exercise of due care in supplying him with such contaminated water.

7. While the doctrine of contributory negligence on the part of the plaintiff obtains in this class of cases, as in all others of actionable negligence, its enforcement depends upon the peculiar facts and circumstances of each case, and those facts and circumstances must be weighed in the light of the relations between the parties.

8. This case is barren of any substantial evidence tending to prove want of due care on the part of the plaintiff. He did what the ordinarily prudent water taker would have done under the same circumstances and therefore fulfilled the measure of duty resting upon him.

Action on the case to recover damages on account of alleged negligence of defendant company in furnishing plaintiff water from the use of which he contracted typhoid fever. Defendant filed plea of general issue. At close of testimony, questions of law of sufficient importance having arisen, case was reported to law court for final determination and all the rights of the parties on so much of the evidence as legally admissible: If the plaintiff prevails, damages to be assessed in the sum of fifteen hundred dollars; if defendant prevails, no cost to be taxed against plaintiff. Judgment for plaintiff for fifteen hundred dollars.

Case stated in opinion.

*W. B. Brown, and J. H. Thorne,* for plaintiff.

*Butler & Butler, and W. R. Pattangall,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, BIRD, HALEY, HANSON, MADIGAN, JJ.

CORNISH, J. This is an action on the case to recover damages sustained by the plaintiff by reason of the defendant's alleged negligence in furnishing him with water from which he contracted typhoid fever.

The defendant corporation was chartered by Chap. 97 of the Private and Special Laws of 1891, for the purpose of "conveying to and supplying the inhabitants of the towns of Madison and Anson, and of such parts of the towns of Starks and Norridgewock as may be within two miles of the Madison and Anson toll bridge, with water for all domestic, sanitary and municipal purposes." The original authorized source of supply was the Kennebec River, but by amendment (Private and Special Laws, 1913, Chap. 176), this was extended to Hayden Lake in Madison and Embden Pond in Embden. The Company was duly

organized, entered into a contract with the Madison Village Corpora-
tion on August 14, 1891, for the supply of hydrants, drinking foun-
tains and the flushing of sewers, and. constructed its water works in
1892.

The general situation is as follows:. The village of Madison lies
on the east bank of the Kennebec River. A short distance out in the
river from the east bank is an island which has been utilized in the
development of the water power at that point. A dam has been con-
structed from the head of this Island extending in a southerly direc-
tion to the west bank of the river, and head gates between the head
and the east bank. The Island and the east bank form a canal. On
this canal, and taking their power from the dam, are the plants of
three manufacturing corporations, the Madison Woolen Company,
the Indian Spring Woolen Company and the Great Northern Paper
Company.

The intake pipe of the Water Company leaves the east bank about
one hundred and fifty or two hundred feet above the head gates and,
as originally constructed, extended into the river about one hundred
and twenty-five feet in a diagonal direction. In 1909 the intake pipe
was extended up the river a further distance of about seven hundred
feet so that the intake itself is now at a point about midway of the
river, which is between five and six hundred feet wide at that place.

The pumping station in use is located on the west bank of the canal
below the bridge. The distributing system is confined to the village
of Madison which contains about two thousand inhabitants, and the
stand-pipe is located northeasterly from and outside the village limits.

Briefly stated, the plaintiff's claim is that he contracted typhoid
fever in December, 1914, from the water supplied by the defendant,
and that the defendant is liable in damages for its negligence in failing
to take proper precautions to prevent pollution at the source of
supply, in neglecting to purify or sterilize the water before distributing
it through its system and in failing to notify the plaintiff or the public
that it was in fact unfit for drinking purposes.

This case is of novel impression in this State, but the principles
involved are those that uniformly pertain to actions of negligence.

In order to recover, the burden rests on the plaintiff to establish
three propositions by a fair preponderance of the evidence, as this
case is before us on report and the Court is sitting with jury powers
on questions of fact. These three propositions are: .

First, that the typhoid fever from which the plaintiff suffered was contracted from the use of the water furnished by the defendant.

Second, that the defendant was guilty of negligence in supplying him with such contaminated water.

Third, that the plaintiff exercised due care on his part and was not guilty of contributory negligence.

We will consider these propositions in their order.

### 1.   THE SOURCE OF THE PLAINTIFF'S DISEASE.

This is purely and simply a question of fact.   From the very nature of the case it is evident that the proof must be wholly circumstantial. Direct and positive evidence is not available.

That typhoid fever is communicated only by taking the germs into the system either by food or drink is admitted.   That the plaintiff was stricken with this disease on December 25, 1914, and that his illness lasted for four months is also conceded.   We think the evidence touching the history and surroundings of the case reasonably establishes these further facts.   The plaintiff came to Madison on September 22nd or 23rd 1914.   His family, consisting of a wife and two children, came about a month later, which was the last of October. His business was that of a baker, and immediately upon his arrival he entered the bakery of one Legendre and continued in his employ until he was taken sick.   At the bakery he drank only from the faucet of the defendant.   For the month prior to the arrival of his family, that is, from the last of September until the last of October, he boarded at the restaurant of one Champagne where spring water was used.   When his family arrived he went to housekeeping in a tenement in the Wentworth Block, used there the public water supply exclusively and continued to do so until he was taken ill.   Champagne testified that the plaintiff boarded at his restaurant a part of the time in November and December, but he had no books or memoranda on which to base his recollection, and his testimony as to dates was indefinite and unconvincing.   As he was testifying more than a year after the event occurred, and in relation to an event unimportant at the time of its occurrence, his unaided recollection as to the date of its occurrence was naturally vague.   On the other hand the testimony of the plaintiff as to the time is clear and positive, and he is corroborated by the circumstances.   After he set up housekeeping he had no occasion to leave his family and board at a restaurant, and that he did

not do so is most probable. The plaintiff has therefore sustained the burden of proof that the only source of his drinking water during the months of November and December immediately preceding his illness was the public supply. According to the medical testimony two weeks are required for incubation, one for the development of the disease, and often three or more days pass before the case is diagnosed and reported, so that from three to four weeks are usually consumed after the germ is taken into the system before the case is reported to the authorities. As the plaintiff fell sick on December 25, 1914, and his case was reported on January 4, 1915, it is probable that the germ was taken sometime in early December. At that time he was drinking the defendant's water exclusively, both when at home and when at work.

All other possible sources of communication are eliminated by the evidence except the milk supply which was from Welch's dairy, and this source is urged by the defendant as a possible cause. It is true that milk is a vehicle of typhoid germs, but milk as it leaves the cow is free from them. The contamination is produced later and, once produced, the germs multiply more rapidly in milk than in water. The origin of the germs however is human excrement and the contamination in either milk or water must come from that source. "It may come through the washing of dishes the milk is in and it may come through a typhoid carrier, who has contaminated, who has pulluted the dishes by handling them with his hands, the vessel the milk is contained in. The milk could be contaminated in that way. I do not understand that there are typhoid germs in the milk when it comes from the cow." These are the statements of Dr. Sawyer, the Chairman of the Madison Board of Health.

But no evidence was introduced attacking the quality of the Welch milk or proving any conditions tending to pollute it. The Board of Health made an investigation of all the milk supplies but they did not condemn any. The mere fact that a person having typhoid fever had used the Welch milk is of no more consequence than that he had used certain bread, in the absence of evidence tending to show contamination of the milk or the bread. It is post hoc, not propter hoc.

But we will trace the evidence a little further. It appears that upon investigation only two persons beside the plaintiff who used the Welch milk contracted the disease. Of these, one used water from a

private well and the other chiefly from the defendant although occasionally from the artesian well in the yard of the Great Northern Paper Company.   So that of the three, two used the town supply.

Two other cases of typhoid fever were reported on the same day as the plaintiff's case.   Both of these were school boys, and of these neither had used the Welch milk, while both used the town water at home and spring water at the public school.   The three cases therefore, reported on January 4, took their milk supply from three different sources but their water supply chiefly from a single source, that of the defendant.

The rule as to burden of proof in this class of cases has been well stated as follows:

"The plaintiff was not legally required to prove by positive testimony and with absolute certainty that the drinking of the water was the cause of the typhoid fever.   The plaintiff satisfied the burden of proof which the law imposed upon him by proving such facts and circumstances from which it was made to reasonably appear that the drinking of the water was the probable efficient cause of the typhoid fever.   *Wilkinson* v. *Standard Oil Co.*, 78 N. J., Law 524.   It is only when it appears that the injuries were occasioned by one of two causes, for one of which the defendant is responsible but not the other, that the plaintiff must prove such facts and circumstances as will exclude the equal probability of the injury having resulted from the cause for which the defendant is not liable."   *Jones* v. *Mt. Holly Water Co.*, 87 N. J. Law, 106; 93 At. 860.

Let us apply this rule in the light of these additional circumstances.

The water was taken from the Kennebec River.   The intake was about nine hundred feet above the head-gates.   The dam created a basin or pond from which the water was drawn.   When the water was below the crest of the dam or of the flash-boards on top of the crest, the only exit was through the head-gates into the canal.   When these gates were closed, the current stopped, and there was more or less of a refluence, an eddying back, especially along the shores, until the pond was again filled and the current began to flow over the flash boards.   Under these conditions one witness testifies that objects would move up river on the surface even as far as the intake.   The sediment and foreign substances at the bottom would be correspondingly stirred up and moved about.

In the Summer and Fall of 1914 there was a severe drought. The river was low. No water ran over the dam from the time the river was frozen in the Fall of 1914 until the latter part of February, 1915. The mill pond was covered with ice. Such was the basin of supply.

What were the possible sources of pollution that might reach this basin while in this condition?

On the west or Anson side, there were several danger spots all above the dam, and at varying distances from the intake. On the banks of Getchell Brook, which empties into the mill-pond at a distance of about twelve hundred feet below the intake, were twelve or fifteen houses, the most of them with water-closets discharging into the brook, which became, as one physician describes it, like an open sewer. Farther down the river and nearer the bridge was a four tenement house with two privies near the bank. Farther up the river and at a point about three hundred and fifty feet above the intake in a diagonal direction was the so-called Powers house where the privy drained into the river. Close by were a pig pen and a pile of hog dressing, both near the water.

The situation on the east or Madison side was fraught with even greater possibilities of contamination. The Great Northern Paper Company used a large tract on the bank for their log piles, extending twelve or fifteen hundred feet up and down the river. Some of these piles were above the intake, some opposite and some below. Above the intake and at a distance from it of about three hundred and fifty feet in a diagonal direction, Rowell Brook empties into the river. This is a stream fifteen or twenty feet wide at its mouth, and narrowing to three or four feet in width at a distance of one thousand feet. Even in low water it is an active stream at that distance from its mouth. It drains a section in the outskirts of Madison Village and beyond the water shed of the thickly settled portion. On Rowell Street, which is within the water shed of Rowell Brook, Mrs. Charles Frazer was taken ill with typhoid fever and her case was reported on September 19, 1914. The natural drainage from her house was into Rowell Brook, but the evidence does not disclose the actual conditions about her house as to toilets.

This brook just before reaching the river runs midway between the log piles. The crew of men employed on these piles during the Summer and Fall varies from ten to twenty. A privy for their use had been built on the bank over the water at a point below the lowest

log pile and about five or six hundred feet below the intake, the excrement falling directly into the mill-pond. But the men were accustomed at times to use also the spaces behind the log piles for toilet purposes, and as the land in that locality is low, all this filth which had accumulated during the dry season was washed into the river at high water chiefly through Rowell Brook. Farther down the east bank was a group of four houses, one of which was occupied in the season of 1914, with drainage into the river.

In addition to all this the village of Bingham, twenty miles above Madison, in 1912 established a public sewage system, the outlet of which was the Kennebec River. Whether or not typhoid fever existed in that village in 1914 does not appear in evidence. The plaintiff's counsel endeavored to ascertain the fact from the Secretary of the Board of Health in that town, but his questions as put in different forms were so strenuously objected to by the defendant's counsel that the vital one was finally withdrawn. It might not be fair to draw any inference of fact from this procedure.

So much for the conditions existing on both sides and above the mill-pond. Various other possible causes of pollution were suggested, but after a careful analysis of the evidence we are not impressed with their importance. They were not shown to be connected with the water supply with sufficient closeness.

The plaintiff's case was one of the earlier ones. As we have already stated, Mrs. Frazer's was reported on September 19. The next was John Withee's which was reported on December 26. His disease however was contracted in Carratunk, a town farther up the river, and he was sick when he was brought to Madison. His house was only four or five hundred feet from the bakery where the plaintiff worked, but as the plaintiff must have contracted the disease before Withee came to Madison there is no connection between the two cases. One other case was reported on January 2, 1915, and three on January 4, the plaintiff's and two others. Other cases followed in rapid succession until there existed what might well be termed an epidemic.

On February 22, a sample of water was taken by the Superintendent of the Electric Light Company from a hole in the ice in the rear of the Powers' house, fifty feet from the shore and three hundred and eight feet in a northwesterly direction from and above the intake.

This was found by Dr. Whittier, Professor of Bacteriology at Bowdoin College to contain a very large quantity of bacteria and he pronounced the water unfit for drinking.

On March 9, 1915, eight samples were taken at various places, during an investigation made by the State Chemist, Mr. Evans, under the direction of the Public Utilities Commission. Every sample except one, which was taken one and one-half miles up the river, gave evidence of sewage pollution and indications of colon bacilli. They varied as to amount. Those taken at the mouth of Rowell Brook, at the intake, at the hotel tap, and at various other places, showed thirty colon bacilli to the ounce, while the sample taken at the mouth of Getchell Brook showed three hundred to the ounce. The water was generally impregnated with sewage pollution. This high percentage did not of itself signify the presence of typhoid germs, but of the existence of a large quantity of sewage. Colon bacilli are normally present in the intestines while the typhoid germ is a parasite. The presence of a large quantity of colon bacilli in water indicates therefore sewage pollution, and naturally the greater the percentage the greater likelihood of the existence of the typhoid germ.

It was soon after these tests were made that the use of the water was condemned unless boiled, and its condition was such that even as late as June 14 the same injunction was given by the State Chemist.

In view of all the foregoing facts, the details of which have already exceeded the reasonable limits of an opinion, we are forced to the conclusion that the source of the plaintiff's illness was the water furnished by the defendant company. Upon this first element in the case he has given the Court satisfactory and convincing proof.

## 2. DEFENDANT'S NEGLIGENCE.

What was the measure of duty resting upon the defendant toward its patrons of whom the plaintiff was one? Speaking in general terms it was the duty of exercising ordinary care and vigilance in furnishing and distributing at all times an adequate supply of wholesome water for domestic use. But here, as always, the degree of care and vigilance necessary to constitute ordinary prudence has relation to the importance of the subject matter and is commensurate with the duty to be performed. When a corporation assumes what is practically an exclusive right to provide a community with such a prime necessity of life as water, sound public policy requires that it

be held to a high degree of faithfulness in furnishing a supply adequate in quantity and wholesome in quality. This is but the exercise of ordinary care applied to the circumstances of the case. From the very nature of the undertaking and the relations of the parties, the consumer must rely upon the proffered supply. Other sources are naturally supplanted, and the health and, to a certain extent, it may be the lives of the consumers are at the mercy of the company.

The rule as to the defendant's liability has been defined in a recent case by the Supreme Court of Connecticut as follows:

"Such a corporation is not a guarantor of the purity of its water or of its freedom from infection; but it is bound to use reasonable care in ascertaining whether there is a reasonable probability that its water supply may be infected with a communicable disease from causes which are known to exist, or which could have been known or foreseen by the exercise of such care; and if the exercise of such care would have disclosed a reasonable probability of such infection, then it becomes the duty of a water company to adopt whatever approved precautionary measures are, under the circumstances of the case, reasonably proper and necessary to protect the community which it serves from the risk of infection." *Hayes* v. *Torrington Water Co.,* 88 Conn., 609, (1914). The New Jersey Court, in a similar action decided in 1915, prescribed the nature of the evidence which would be probative of negligence in these words: "Actual notice or knowledge of the unwholesomeness of the water of the defendant company was not an essential element to be proven in order to establish the defendant's liability. It was sufficient if there was testimony tending to show that the defendant in the exercise of reasonable care might have discovered the unwholesomeness and dangerous condition of the water." *Jones* v. *Mt. Holly Water Co.,* 87 N. J., Law, 106.

The application of these rules to the facts and circumstances in the pending cause shows a failure on the part of the defendant to faithfully perform its legal obligations, both in apprehending the danger and in taking precautionary measures to avert it.

In the first place the reasonable probability of typhoid infection should have been apparent to careful and watchful minds charged with a responsibility so grave as theirs. The general situation might have created apprehension. It is a commonly accepted scientific fact that the water from a stream or river flowing through villages and populated country is viewed with suspicion and such sources of

public supply have been gradually abandoned, and the lakes utilized in their place. Dr. Whittier, whose testimony before the Public Utilities Commission, in their investigation of this matter, was admitted at this trial, so far as legally admissible, stated that he did not think it was safe for a town to take its water supply at any point in the Kennebec River below Madison or immediately above Madison.

In the second place, when we pass from the general to the specific situation the menace increases. The possible sources of pollution from the banks and watershed on both sides of the mill pond from which this supply was taken have already been pointed out in detail and need not be repeated. These conditions had existed for years and no attempt whatever had been made by the defendant to abate or correct them, although the charter of the company as well as the general laws of the State gave ample power for its protection. The company's agents did not investigate or attempt to ascertain these conditions although a superficial examination would at any time have revealed them to the attentive eye. The defendant should have anticipated trouble and not have waited until the trouble arrived. Ordinary prudence in such a situation looks to the future, and endeavors to avert probable or possible danger. It does not allow one to sit idly by until the blow has fallen.

In the third place, the history of typhoid fever in Madison should have given the defendant reasonable grounds for anxiety. We have the record of the reported cases for a period of eight years. It is as follows: In 1907, ten cases; 1908, fifty-five cases; 1909, fifteen cases 1910, twenty-one cases; 1911, sixteen cases; 1912, nine cases; 1913, four cases; 1914, five cases. The evidence as to the number in 1915 when the last epidemic occurred, of which the plaintiff's case was one, was objected to by the defendant and excluded. But the Chairman of the Board of Health had already testified that for the ten years ending December 31, 1915, there had been one hundred and sixty-two reported cases, or an average of more than sixteen each year. This revealed a condition, in a village of two thousand inhabitants, that called for investigation and action. After the epidemic of 1908, with its fifty-five cases, the defendant, after conferences with the Board of Health, extended the intake pipe up river about seven hundred feet, and to a point even farther than the Board had recommended. That however only partially solved the problem, because

in 1909 there were fifteen cases, in 1910, twenty-one, and in 1911, sixteen. For the next three years the number diminished, the lowest being in 1913, four cases.

In the fourth place and finally the defendant had been specifically and frequently warned.

The conditions on the bank of the river and on the streams continued, and to increase the peril, Bingham, twenty miles up the river, installed a partial sewage system with which, including both public and private sewers, twenty residences beside the hotel were connected. All this sewage emptied into the Kennebec River. This possible peril Mr. Evans had taken pains to guard the officers of the company against as early as 1908, and on October 7, 1912, he informed them of the installation of the Bingham sewers and their likelihood to affect the water supply. The officers of the company however made no investigation to ascertain the condition at Bingham or the quantity of sewage that was coming into the river from that source.

Repeated warnings had been given to the Company by Mr. Evans, but without apparent avail. On April 14, 1913, he wrote: "During the past year there has been evidence of more drainage water entering the upper river. This has not been enough to seriously affect this water as yet. It should however be understood that with the natural increase in population on the upper watershed, and especially with the introduction of sewage systems by the towns above your intake, serious pollution of the water is sure to take place in the future; and so it would be well to be prepared for such a condition by considering the desirability of either filtering the river water or using a lake or ground supply." On October 13, 1913, Mr. Evans again reported: "The analysis shows this water to be in the poorest chemical condition that I have found it during the past two years. The recent rains have washed into the river much organic refuse, which had accumulated on the banks during the Summer, and the increased current has brought some little sulphite wash to the intake. . . . No sewage bacteria were found in this sample, so that its use for drinking should not cause intestinal disease. It is worthy of note, however, that if sulphite wastes are being brought to your intake, that there is the chance of sewage wastes also being brought down when once sewage systems appear in the towns above you. At the

present time the water is safe to drink, but it is not of high quality. . . . It is entirely probable that means will have to be adopted to purify this water in the near future."

This caution was repeated in Mr. Evans' report of January 12, 1914, in these plain words: "As I have called to your notice before, this water is one that is sure to become polluted as soon as sewers are installed by the towns on the upper river, and is likely to be so polluted for short times after heavy rains in the Spring and fall. As a result the water is one that should be carefully watched and provision made for sterilization of the water at once on the installation of sewers by the towns above you. It would be preferable to have such a plant for emergency use in the spring and fall even now." Sewers had already been installed in Bingham, but not in the intervening town of Solon, so far as the evidence discloses.

Confronted with all these facts, the natural conditions of the source of supply, the lurking perils on either bank, the sewage system above, the persistence of the disease year after year, the repeated warnings and suggestions of the State Chemist, especially during the two years, 1913 and 1914, immediately preceding the last outbreak, what steps did the defendant take, after the extension of its intake pipe in 1909, to protect its supply or to filter or sterilize it before distribution? Practically nothing. At one time the State Chemist spent two days on the ground in an investigation, and the superintendent states that no conclusion was reached although they viewed the water with suspicion. The superintendent also sent a bottle of water four times a year to Mr. Evans for analysis, and received his reports thereon, stating that "in its present condition" it was suitable for drinking purposes, but at the same time incorporating the cautions and suggestions before referred to.

What practical good, it may properly be asked, did the securing of the quarterly analysis accomplish? None whatever. It furnished no preparation against the predicted day of evil. When that day came in 1915, the Company was helpless. Ordinary prudence would have prompted the anticipation of that day, and the avoidance of the epidemic either by going to some other source of supply or by the proper filtration of the water from this source. The former remedy may have been disproportionately expensive, but the latter could and should have been provided.

The excuse offered by the defendant is that it always stood ready to install a filter and had so notified the Madison Village Corporation, but its members were not in favor of the plan. There is evidence which leads us to believe that these people were not opposed to the purification of the water, but doubted whether it could be made suitable for drinking purposes by the proposed filtration.

However that may be, the duty rested on the defendant to use due care and diligence in providing its customers with a supply of wholesome water, and if the conditions were such that ordinary prudence and vigilance dictated the installation of a filtration plant, one should have been installed. The plaintiff's rights were not affected by the views of the Village Corporation.

Reverting now to the rule defining the defendant's duty, it is the opinion of the court that the exercise of reasonable care on the part of the defendant would have discovered the reasonable probability of infection from typhoid germs long prior to the plaintiff's illness, and that being so, it became the duty of the defendant to adopt whatever precautionary measures were reasonably proper and necessary, under the circumstances, to protect the community which it served from the risk of infection. No protective measures were adopted or attempted. Something more than masterly inactivity was demanded *Hayes* v. *Torrington Water Co.*, 88 Conn., 609, supra. *Jones* v. *Mt. Holly Water Co.*, 87 N. J., Law, 106, supra.

3. PLAINTIFF'S CONTRIBUTORY NEGLIGENCE.

But the defendant contends that even granting the existence of negligence on its part, there was similar negligence on the part of the plaintiff which precludes recovery.

It relies upon *Green* v. *Ashland Water Co.*, 101 Wis., 258, 43 L. R. A., 117, where the court held as follows:

"If the source of supply be contaminated with sewage for a long period of time, causing typhoid epidemics annually in the community for several years, and the facts in that regard be notorious and a matter of common knowledge, the presumption is that members of such community of ordinary intelligence have notice of that situation; and in the absence of evidence to the contrary that presumption will prevail and preclude a recovery by a person injured by the use of such water, on the ground of his contributory fault. Therefore, if one drinks water furnished by a water company, with knowledge or

reasonable means of knowledge, that it is dangerously polluted with sewage, he takes upon himself the risk, and if he die, there may be no recovery on the ground of deceit or negligence. Notice may be implied from a general knowledge of the facts in the community." The facts in that case warranted the court in finding contributory negligence on the part of the plaintiff. The court state them to be in part as follows: "He (the plaintiff) knew that the sewage of the city was drained into the bay, and that the defendant's water supply was taken therefrom. He was an intelligent, reading, working man. He took one of the city papers wherein the dangers of taking water from the bay were discussed. He had typhoid fever in his family six months before he was stricken, his wife being the afflicted party. She was attended by Dr. Hosmer, one of the plaintiff's witnesses, who was thoroughly conversant with the condition of defendant's water supply and who probably talked with the deceased on the subject as he did with intelligent men generally, it being a matter of common talk. . . . . The facts in that regard were understood in the city generally, and had been the subject of discussion at public meetings and in the City Council, and in the newspapers and among the people for a long time. There is no evidence in the record to rebut the presumption that the deceased had notice of what was so commonly known." Under these facts the court held that the plaintiff did not exercise due care.

No such facts however exist in the case at bar. The plaintiff, it is true, had lived in Madison four years ending in 1909, and therefore must have known of the typhoid epidemic of 1908. But after that time he was absent from Madison for five years and until late September, 1914. During the three months before he was stricken there was no general discussion of the subject, no public meetings so far as the record shows, and he testifies that he had no reason to distrust the quality of the water. No warning had ever been given him. This testimony is not overborne.

The defendant argues that everything which has been described with regard to the possibility of pollution from different sources was as apparent to the plaintiff as to the defendant and imposes the same want of due care upon the one as the other. Not so. The two parties were not on a parity. The plaintiff was not in law held to such strict account as the defendant. It is no part of the duty of the consumer to investigate the water supply and ascertain possible

sources of pollution.   That duty rests on the water company together with the further duty of taking such positive action as is necessary for the protection of its customers.   It cannot shift these obligations to the shoulders of the plaintiff.   While therefore the doctrine of contributory negligence obtains in this class of cases, as in all others of actionable negligence, its enforcement depends upon the peculiar facts and circumstances of each case, and these facts and circumstances must be weighed in the light of the relations between the parties.

This case is barren of any evidence tending to prove want of due care on the part of the plaintiff.   He did what the ordinarily prudent water taker would have done under the same circumstances and thereby fulfilled the measure of duty resting upon him.

Our conclusion therefore is that the plaintiff has maintained, by a fair preponderance of the evidence, the three elements embraced in this action, and is entitled to recover.

According to the stipulation under which this case was reported to this court, damages are to be assessed by agreement in the sum of fifteen hundred dollars in case the action is sustained.   The entry must therefore be,

*Judgment for plaintiff for $1500.*