Passaic District Court.

DAVID SEIDEN, INDIVIDUALLY AND TRADING AS THE
HOTEL LINCOLN, PLAINTIFF, v. PASSAIC VALLEY
WATER COMMISSION, A DULY CONSTITUTED PUBLIC
QUASI CORPORATION, DEFENDANT.

Decided May 11, 1938.

For the plaintiff, *Martin Klughaupt*.

For the defendant, *Louis J. Bohl*.

VANNAMAN, D. C. J. The action is in tort. The plaintiff
is the owner and operator of the Lincoln Hotel. The defend-
ant is a public *quasi* corporation engaged in the business of
a water commission and so authorized by statute. It has
forty thousand subscribers and between two hundred and
fifty thousand and three hundred thousand consumers. It
has exclusive control and possession over the water mains
and pipes which lead to the plaintiff's meters and to the
meters of other subscribers who use the defendant's water.
The plaintiff has been a continuous subscriber and user of the
defendant's water since 1928. Toward the latter part of
1935 the plaintiff found that the plumbing system in his
hotel was clogged; that the faucets leaked; and that the
pipes in the plumbing system made rattling noises when the
water was used. Thereupon the plaintiff notified the defend-
ant of the existing condition. The condition persisted until
the end of 1936.

In the latter part of 1935, when the plaintiff discovered the condition, he hired a plumber who, upon examination, found that there was an excessive amound of sand in the water; that the water containing the sand came exclusively from the defendant's water mains which led to the plaintiff's plumbing system. As a result of the sediment in the water, the plaintiff's plumbing system was damaged and it became necessary for him, on several occasions during that period, to have the plumber repair and clean the affected parts of his plumbing system. The condition no longer exists. The plaintiff brings this action for damages sustained by him as a result of the injury. The doctrine of *res ipsa loquitur* invoked by the plaintiff finds proper application under the facts of the case. *Cf.* 59 *N. J. L. J.* Nos. 24, 25, 26, June 11th, 1936, &c.

At the end of the plaintiff's case, the defendant moved for nonsuit on several grounds. The first and sixth grounds are that the only duty of the defendant is to deliver potable water fit for domestic use. These will be considered hereafter.

The second ground is that the doctrine of *res ipsa loquitur* does not apply because the defendant did not have exclusive control over the water mains. The court has found as a fact that the defendant did have exclusive control over the water mains.

The third ground is that the doctrine of *res ipsa loquitur* does not apply because the presence of excessive sand in the water was not an unusual occurrence. What is an unusual occurrence? In *Cleary* v. *Camden* (1936), 118 *N. J. L.* 215; 192 *Atl. Rep.* 29, in an opinion by Mr. Justice Perskie, the court sets forth the established rule to be (at *p.* 219) :

"Where the thing (which caused the accident) is under the management of the defendant, or his servant, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from the want of care."

Tested by that rule and as a matter of fact, the excessive sand in the water was an unusual occurrence.

The fourth ground is that there was no proof that the defendant had knowledge of the presence of excessive sand in the water. The court finds as a fact that the defendant did have knowledge of the presence of excessive sand in the water. Further, in *Jones* v. *Mt. Holly Water Co.*, 87 *N. J. L.* 106; 93 *Atl. Rep.* 860 (at *p.* 109) the court held:

"Actual notice or knowledge of the unwholesomeness of the water of the defendant company was not an essential element to be proven in order to establish the defendant's liability; it was sufficient if there was testimony tending to show that the defendant in the exercise of reasonable care might have discovered the unwholesomeness and dangerous condition of the water."

The court finds that the defendant in the exercise of reasonable care should have discovered the presence of excessive sand in the water.

The fifth ground is that the plaintiff is guilty of contributory negligence. Sufficient answer is found to this argument in the case of *Hamilton* v. *Madison Water Co.*, 116 *Me.* 157; 150 *Atl. Rep.* 659 (citing *Jones* v. Mt. Holly with approval); *Waters*, 67 *Corp. Jur.* 1282, § 842, &c., where it is held:

"It is no part of the duty of the consumer to investigate the water supply and ascertain possible sources of pollution. That duty rests on the water company together with the further duty of taking such positive action as is necessary for the protection of its customers. It cannot shift these obligations to the shoulders of the plaintiff."

The motion for nonsuit was denied and an exception taken.

*Jones* v. *Mt. Holly Water Co. supra* (at *p.* 109):

"Water is a necessity of life and one who undertakes to trade in it and supply customers stands in no different position to those with whom he deals than does a dealer in foodstuffs. He is bound to use reasonable care that whatever is supplied for food or drink shall be ordinarily and reasonably pure and wholesome."

And in the same case,

"The duty resting upon the water company was to furnish its customers, for consumption, pure and wholesome water."

These principles have found universal application. In *Waters*, 67 *Corp. Jur.* 1282, § 842, the text writer, discussing the subject, holds:

"While a water company is not an insurer or guarantor of the purity of its water or of its freedom from infection, it is bound to use reasonable care in ascertaining whether there is a reasonable probability that its water supply may be infected with a communicable disease from causes which are known to exist, or which could have been known or foreseen by the exercise of such care; and for failure to use such care, it will be liable in damages to persons injured by reason of the impurity; and if the exercise of such care would have disclosed a reasonable probability of such infection, then it becomes the duty of a water company to adopt whatever approved precautionary measures are, under the circumstances, reasonably proper and necessary to protect the community which it serves from the risk of infection."

See, also, 5 *A. L. R.* 1402; 13 *A. L. R.* 1132; 61 *A. L. R.* 452; *Canavan* v. *City of Mechanicsville*, 229 *N. Y.* 473; 128 *N. E. Rep.* 882; 19 *Mich. L. Rev.* 667; 30 *Yale L. Journal* 425; 5 *Cornell L. Quar.* 470; 6 *Cornell L. Quar.* 207.

In these citations water companies have been held liable for infected and polluted water. In the case at hand the claim is not for injuries resulting from using the water for its ultimate purposes but rather for damages resulting from an excessive amount of sand in the water which injured the subscriber's plumbing system. The legal issue is: What is the extent of the duty of a water company supplying water to the subscriber? That it must be potable and fit for domestic use is conceded. Must it also be free from sediment which may damage the subscriber's plumbing system and property? The court so believes.

Civilization has progressed and life made more enjoyable

with the advance of science. It is no longer necessary nor should it be, to go to the well with a bucket. Water can be and is delivered through pipe lines. Water companies should be and are under a legal duty to properly distribute it. The delivery of the water is equally as important as the water itself. Water companies are obligated not only to furnish the commodity but to provide for its delivery. As well as they are answerable for furnishing polluted water, so also they are answerable for furnishing water which interferes with or impedes its own free flow through the common and ordinary water conduits and systems. The defendant is just as liable for injuries to the plaintiff's property resulting from water containing excessive sand as it is for injuries to the plaintiff's person resulting from polluted water.

From the defendant's case it appears that prior to 1934 the plaintiff received raw or unfiltered water. In December of 1933, and for sometime previous to that, the defendant began to receive complaints from its subscribers that the water was distasteful, discolored and odoriferous. As a result of those complaints it became necessary for the defendant to construct filters to remove the impurities.

There are two types of water filters: Pressure filters and gravity filters. Pressure filters induce the discharge of sand into the water system. Gravity filters restrain the discharge of sand into the water system.

In November, 1934, the defendant erected twelve pressure filters which were placed in operation in July, 1935. The defendant advances two main reasons to justify the construction of pressure filters rather than gravity filters: First, they were necessary. Second, they were cheaper.

To sustain its first contention, the defendant shows that the water came from the Wanaque Reservoir which is three hundred feet above sea level and that it went to the Little Falls filtration plant, which is one hundred and forty feet above sea level. It was not necessary to restore the lost pressure with the use of pressure filters. However, if gravity filters could have been erected at the Wanaque Reservoir there

would be no need for restoring pressure even though there would be such a need if those gravity filters were erected at Little Falls. The defendant has argued that it could not erect gravity filters at the Wanaque Reservoir because it did not own the property. But, there has been no proof offered by the defendant to satisfactorily explain why it could not, or did not, exercise its power of eminent domain to obtain the use of that property. *Rev. Stat.* 21:1 and 58:6-1.

The second reason advanced by the defendant for installing pressure filters rather than gravity filters is that it was cheaper. It appears that the defendant owned twenty pressure filters which were not in use at the time it became necessary to install filters, and, therefore, they could be erected at a saving. Besides, it would cost between $50,000 and $70,000 a year more to maintain gravity filters at Little Falls as compared with pressure filters. The court is not impressed with this argument for two reasons: (a) The saving is for the benefit of the company only. In the eyes of the law the water company stands in the same position as a private corporation. *Cf. Waters,* 67 *Corp. Jur.* 1168, § 643, *note* 67; cases collected under*New Jersey and Atlantic Digest, Municipal Corporations,* 24 *N. J. D.,* § 733 (4); *Olesiewicz* v. *City of Camden,* 100 *N. J. L.* 336; 126 *Atl. Rep.* 317; *Morgan-weck* v. *Egg Harbor City,* 147 *Atl. Rep.* 468; *Zboyan* v. *City of Newark,* 104 *N. J. L.* 258; 140 *Atl. Rep.* 225. (b) The saving, even if it might be construed as beneficial to the subscriber, could only be had at the risk of an ultimate and far greater loss to the subscriber by reason of a damaged plumbing system.

It further appears that if sand traps were erected with the pressure filters, they would have completely prevented the discharge of sand into the water system. Based upon an accepted principle of hydraulic engineering, sand traps have long been recognized as a means for removing sand from water. The defendant did not start to design sand traps until the latter part of 1936. They were not placed into operation until the early part of 1937 although it appears that the

defendant received complaints of excessive sand in the water immediately after the twelve pressure filters were placed in operation in July of 1935. It takes two or three months to construct a sand trap and the reason advanced by the defendant for its failure to erect and operate a sand trap prior to the early part of 1937 is that the defendant sought "the most economical type of sand trap."

At no time did the defendant attempt to explain why it took so long, after it had learned of the excessive sand in the water, to complete the sand traps. The only two things that the defendant did to alleviate the condition was to flush the various parts of the water system and replace the sand in the filters with a substance called anthrafilt. Neither of these removed the cause. Excessive sand was still discharged into the plumbing system of the subscribers.

The court finds that the defendant was guilty of negligence because:

1. It did not prove sufficient facts to show that in failing to exercise its power of eminent domain, so that gravity filters could be erected at Wanaque Reservoir, its conduct was consonant with the exercise of reasonable care.

2. It did not prove sufficient facts to show that the increased cost which would have been necessary if gravity filters were erected at Little Falls was so great as to indicate that its action in using the cheaper method was consonant with the exercise of reasonable care.

3. It did not prove sufficient facts to show that in failing to erect sand traps immediately that the pressure filters were erected its conduct was consonant with the exercise of reasonable care.

4. It did not prove sufficient facts to show that the length of time it took to erect the sand traps was a reasonable length of time under the circumstances and, therefore, was consonant with the exercise of due care.

Judgment will be entered in favor of the plaintiff in the sum of $102.30.