THOMAS E. STUBBS, Appellant, *v.* THE CITY OF ROCHESTER, Respondent.

**Municipal corporations — negligence — typhoid fever alleged to have been caused by drinking contaminated water — when evidence in action to recover therefor sufficient to warrant submission to jury — improper dismissal of complaint.**

1. If two or more possible causes exist, for only one of which a defendant may be liable, and a party injured establishes facts from which it can be said with reasonable certainty that the direct cause of the injury was the one for which the defendant was liable, the party has complied with the spirit of the rule that when there are several possible causes of injury for one or more of which a defendant is not responsible, plaintiff cannot recover without proving that the injury was sustained wholly or in part by a cause for which defendant was responsible.

2. Plaintiff brings this action, asserting that he became ill by reason of drinking contaminated water supplied by the defendant, and seeks to recover damages by reason thereof. Upon examination of the evidence, *held*, that the case on the part of plaintiff was not so lacking in proof as matter of law that his complaint should be dismissed, but that the most favorable inferences deducible from the plaintiff's evidence were such as would justify a submission of the facts to a jury as to the reasonable inferences to be drawn therefrom, and a verdict rendered thereon for either party would rest not in conjecture but upon reasonable possibilities.

*Stubbs v. City of Rochester*, 174 App. Div. 904, reversed.

(Argued March 13, 1919; decided July 15, 1919.)

APPEAL from a judgment entered September 13, 1916, upon an order of the Appellate Division of the Supreme Court in the fourth judicial department, overruling plaintiffs' exceptions, ordered to be heard in the first instance by the Appellate Division, denying a motion for a new trial and directing judgment in favor of defendant upon the nonsuit granted at the Trial Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Charles Van Voorhis* for appellant. It was a question of fact for the jury to determine whether or not the plaintiff contracted typhoid fever from drinking contaminated water. (*Lyons* v. *S. A. R. R. Co.*, 89 Hun, 374; 152 N. Y. 654; *Purcell* v. *Lanere*, 14 App. Div. 33; *People* v. *Benham*, 160 N. Y. 402.)

*B. B. Cunningham, Corporation Counsel* (*Charles L. Pierce* of counsel), for respondent. Plaintiff's case as to how he contracted his typhoid rests wholly upon conjecture. (*Ruback* v. *McCleary, Wallin & Crouse*, 220 N. Y. 188; *Link* v. *Sheldon*, 136 N. Y. 9; *Ruppert* v. *B. H. R. R. Co.*, 154 N. Y. 90; *Webber* v. *T. A. R. R. Co.*, 12 App. Div. 512.)

HOGAN, J. This action was brought by plaintiff to recover damages alleged to have been sustained by him due to drinking contaminated water from the defendant's domestic service.

During the year 1910 and for many years prior thereto the defendant under legislative authority was engaged in the business of selling water to its inhabitants. A duty was imposed on the commissioner of public works to provide an abundant supply of wholesome water for public and private use, to devise plans and sources of water supply, to plan and supervise the distribution of water through the city and to protect it against contamination. The city has two systems of water supply. One for potable water brought by it from Hemlock lake some distance south of the city to reservoirs near the city and thence distributed by gravity to consumers. That system is known as the Hemlock system. The second or Holly system for fire purposes in the business district, the water being pumped from the Genesee river near the center of the city into a separate set of distributing pipes. The Holly system carried a pressure of from sixty to seventy pounds to the square inch which

in case of fire was increased to one hundred thirty pounds. The pressure in Hemlock system was about fifty pounds to the square inch. The Erie canal ran through the city. A number of lift bridges, including one at Brown street, crossed the same. The bridges were raised by admitting water under pressure to a cylinder forcing a piston out and raising the platform of the bridge. The pipes furnishing water to the cylinders were " Y " shaped; one branch being connected with the Hemlock system and the second branch with the Holly system. Gates were installed in each pipe at a point about 20 feet back from the place of connection with the " Y " pipe to control the flow of waters therein. If the gates in both pipes were open at one time both systems would discharge water into the " Y " pipe. If one gate was closed the discharge would be confined to the other pipe. The employees of the city had possession of the wrenches or keys by which these gates could be opened or closed, the water for operating the bridge being furnished by the city.

A check valve was installed in the Hemlock pipe at a point between the gate and the piston pipe for the purpose of preventing the water from the Holly system entering the pipe of the Hemlock system as it otherwise would when the gates in both pipes were open because of the greater pressure in the Holly system; thus when the pressure of the water is toward the piston pipe the valve will open and permit the water to flow freely, but when the stronger pressure is from the opposite direction the valve closes and remains closed so long as the greater pressure remains. When closed the water from the Holly system is prevented from entering the Hemlock system pipes.

Above the point where the defendant pumps water from the Genesee river into the Holly system mains a large quantity of sewage from villages and public institutions is discharged into the Genesee river and at times

water from the Erie canal overflows into the river. The evidence disclosed that a number of drains from buildings in the city also discharged into the river. The water used for the purpose of operating the lift bridges is shut off in the fall of the year at the close of navigation on the Erie canal and turned on when navigation is resumed, usually about May. In the year 1910 the gates of the two systems located near the Brown street bridge were opened by direction of the superintendent of water works of the city. In June, 1910, numerous complaints were received by the superintendent from inhabitants, consumers of the Hemlock water, residing or employed in the vicinity of Brown street bridge, in substance that the water was roily, dirty and had an offensive odor. No attention was given the matter of complaints until one resident called upon the health commissioner of the city and the latter accompanied the complainant to her home, observed the condition of the water, took a sample of the water from the faucet and observed that it looked and smelled badly. He thereupon had it analyzed by a chemist which analysis disclosed a serious condition of contamination. The health officer thereupon notified the public through the newspapers not to drink the water without boiling it, continued his investigation, collected water from a number of houses and caused an analysis to be made of same which disclosed contamination and he thereupon notified the water department that the Hemlock water was contaminated. The latter department started an investigation on October 2d, upwards of three months after many complaints had been made to it, and upon arrival at the Brown street bridge discovered the source of contamination to be at that point and that water from the Holly system was being discharged through the Hemlock system pipes. The water was thereupon shut off and a few days later the discovery was made that there was no check valve in the pipe of the Hemlock system and the water of the

two systems commingled and were being furnished to consumers in that locality as potable waters.

The plaintiff, a resident of the city of Rochester and a machinist, was employed by a firm whose place of business was at the corner of Allen and Platt streets, about one block from the Brown street bridge. The factory was supplied with Hemlock lake water for drinking purposes. Plaintiff drank the water from time to time, using his individual drinking glass. He was taken ill September 6, 1910, with typhoid fever and was sick in bed for six weeks and unable to work for some twelve weeks. Asserting that his illness was caused by reason of drinking contaminated water supplied by the city, he seeks to recover damages by reason thereof. The evidence disclosed upon the trial clearly established that the water furnished by the defendant for potable purposes in the locality of the Brown street bridge was contaminated. The negligence of the defendant charged is — that it carelessly and negligently permitted poisonous and polluted water from the Genesee river to flow through the Holly system mains and pipes into the mains and pipes of the Hemlock system thereby polluting and contaminating the Hemlock water rendering the same dangerous to life and health of the inhabitants of the city in violation of its duty to furnish pure and wholesome water; a failure to inspect the pipes from time to time to discover whether or not the check valve was in place and operating and failure to exercise diligence in a discovery of the nature and source of the contamination following many complaints as to the condition of the water. The facts adduced upon the trial were ample to permit a consideration of the question of negligence of the city by a jury and if found by a jury to sustain such finding. It is argued by counsel for the city that plaintiff's case as to how he contracted typhoid fever rests wholly upon conjecture. Upon the appeal to the Appellate Division after the first trial the latter

court reversed the judgment recovered by plaintiff upon that ground. (163 App. Div. 245.) Upon the appeal to the Appellate Division in the case under review two of the justices, who concurred for reversal on the first appeal on the ground stated, dissented from the decision affirming the nonsuit at Trial Term, presumptively indicating that the evidence upon the second trial had been supplemented by additional testimony and rendered the earlier decision distinguishable from the present record.

The important question in this case is — did the plaintiff produce evidence from which inference might reasonably be drawn that the cause of his illness was due to the use of contaminated water furnished by defendant. Counsel for respondent argues that even assuming that the city may be held liable to plaintiff for damages caused by its negligence in furnishing contaminated water for drinking purposes, (a) that the evidence adduced by plaintiff fails to disclose that he contracted typhoid fever by drinking contaminated water; (b) that it was incumbent upon the plaintiff to establish that his illness was not due to any other cause to which typhoid fever may be attributed for which defendant is not liable. The evidence does disclose several causes of typhoid fever which is a germ disease, the germ being known as the typhoid bacillus, which causes may be classified as follows:

*First.* Drinking of polluted water. *Second.* Raw fruits and vegetables in certain named localities where human excrement is used to fertilize the soil are sometimes sources of typhoid infection. *Third.* The consumption of shell fish, though not a frequent cause. *Fourth.* The consumption of infected milk and vegetables. *Fifth.* The house fly in certain localities. *Sixth.* Personal contact with an infected person by one who has a predilection for typhoid infection and is not objectively sick with the disease. *Seventh.* Ice if affected with typhoid bacilli. *Eighth.* Fruits, vegetables, etc., washed in infected water.

*Ninth.* The medical authorities recognize that there are still other causes and means unknown. This fact was developed on cross-examination of physicians called by plaintiff.

Treating the suggestions of counsel in their order, (a) that the evidence fails to disclose that plaintiff contracted typhoid fever by drinking contaminated water. The plaintiff having been nonsuited at the close of his case is entitled to the most favorable inference deducible from the evidence. That plaintiff on or about September 6th, 1910, was taken ill and very soon thereafter typhoid fever developed is not disputed. That he was employed in a factory located one block distant from the Brown street bridge in which Hemlock lake water was the only supply of water for potable and other purposes, and that the water drawn from faucets in that neighborhood disclosed that the water was roily and of unusual appearance is not questioned. And no doubt prevails that the Holly system water was confined to the main business part of the city for use for fire purposes and sprinkling streets and is not furnished for domestic or drinking purposes.

The evidence of the superintendent of water works of the city is to the effect that Hemlock lake water is a pure wholesome water free from contamination of any sort at the lake and examinations of the same are made weekly; that the Holly water is not fit for drinking purposes taken as it is from the Genesee river. Further evidence was offered by plaintiff by several witnesses, residents in the locality of Brown street bridge, who discovered the condition of the water at various times during July, August and September and made complaint to the water department of the condition of the same. Dr. Goler, a physician and health officer of the city, was called by plaintiff and testified that in September when complaint was made to him by a resident of the district he went to the locality, visited houses in the

immediate neighborhood, found that the water drawn
from the faucet of the Hemlock supply looked badly and
smelled badly. He took a sample of the water to the
laboratory and had it examined by a chemist who found
that it contained an increase in solids and very many
times, that is twenty to thirty times as much chlorine
or common salt as is found in the domestic water supply —
the presence of chlorine in excessive quantities indicates
contamination in that quantity, bad contamination and
usually sewage contamination. Further examination
followed in the district. Water was collected from
various houses and a large number of samples, perhaps
less than one hundred, but over twenty-five. . The
examination continued and the wedge of the city outlined
by the river and city line and Magne street had the
domestic water supply contaminated in the same way.
An examination of the water of the Holly system dis-
closed the same, very similar in quantity of chlorine
or common salt contents as the domestic water supply
in the houses in the immediate neighborhood of Oak
and Frank streets, but further north from what
was eventually the point of greatest contamination the
amount of chlorine grew less. About the following day,
the source of contamination having been discovered, the
doctor made an investigation as to the reported cases
of typhoid fever in the city in the months of August,
September and October for the purpose of determining
the number of cases, where the cases came from, what
gave rise to it, and he stated that in his opinion the
outbreak of typhoid was due to polluted water, con-
taminated as he discovered afterwards by sewage. In
answer to a hypothetical question embracing generally
the facts asserted by plaintiff the witness testified that
he had an opinion as to the cause of the infection of
plaintiff and such opinion was that it was due to con-
taminated water.

Doctor Dodge, of the faculty of the University of

Rochester, a professor of biology, also bacteriologist of the city of Rochester, about October first made an analysis of samples of water taken from No. 58 Warehouse street and from the Holley system, corner of Oak and Platt streets. The analysis of the water from Warehouse street disclosed the number of bacteria to be 880 cubic centimeter. The analysis of the Holly water disclosed four thousand bacteria cubic centimeter. An analysis of the Hemlock water at the University disclosed approximately 150 to 200. While his examination did not disclose any colon bacillus, it did disclose some evidence of the same. Dr. Brady, the physician who attended the plaintiff, and Dr. Culkin both testified that in their opinion the plaintiff contracted typhoid fever from drinking polluted water.

Plaintiff called a witness who resided on Brown street about two minutes' walk from the bridge and proved by her that she drank water from the Hemlock mains in the fall of 1910 and was ill with typhoid fever. Thereupon counsel for defendant stipulated that fifty-seven witnesses which the plaintiff proposed to call will testify that they drank water from the Hemlock taps in the vicinity of the district west of the Genesee river and north of Allen street in the summer and fall of 1910 and during said summer and fall suffered from typhoid fever, that in view of the stipulation such witnesses need not be called by plaintiff and the stipulation shall have the same force and effect as though the witnesses had been called and testified to the facts.

The plaintiff resided with his wife some three miles distant from the factory where he was employed. The water consumed by him at his house outside the infected district was Hemlock water. The only water in the factory was Hemlock water and he had there an individual cup from which he drank. He was not outside of the city during the summer of 1910. Therefore, the only water he drank was in the city of Rochester.

A table of statistics as to typhoid fever in the city of Rochester for the years 1901–1910, inclusive, was produced by the health officer and received in evidence. That exhibit was the subject of comment in the opinion of Justice FOOTE upon the first appeal. The fact is evident from a perusal of his opinion that upon the first trial plaintiff did not undertake to establish the number of cases of typhoid fever in the district where the water was contaminated as compared with the total number of cases in the city in 1910, which evidence was supplied upon this trial. The statistics disclose that the number of typhoid cases in the city in 1910 was 223, an excess of 50 cases of any year of the nine years preceding. Recalling that complaints as to water commenced in the summer of 1910 and as shown by the evidence that typhoid fever does not develop until two or three weeks after the bacilli have been taken into the system, in connection with the fact that the source of contamination was not discovered until October, the statistics disclose that of the 223 cases of typhoid in the city in the year 1910, 180 cases appear during the months of August, September, October and November as against forty-three cases during the remaining eight months; thirty-five of which were prior to August and eight in the month of December, two months after the source of contamination of the water was discovered.

The evidence on the trial discloses that at least fifty-eight witnesses, residents of the district, drank the contaminated water and suffered from typhoid fever in addition to plaintiff; thus one-third of the 180 cases during the months stated were shown to exist in that district.

Counsel for respondent asserts that there was a failure of proof on the part of plaintiff in that he did not establish that he contracted disease by drinking contaminated water and in support of his argument cites a rule of law, that when there are several possible causes of injury

for one or more of which a defendant is not responsible, plaintiff cannot recover without proving that the injury was sustained wholly or in part by a cause for which defendant was responsible. He submits that it was essential for plaintiff to eliminate all other of seven causes from which the disease might have been contracted. If the argument should prevail and the rule of law stated is not subject to any limitation the present case illustrates the impossibility of a recovery in any case based upon like facts. One cause of the disease is stated by counsel to be " personal contact with typhoid carriers or other persons suffering with the disease, whereby bacilli are received and accidentally transferred by the hands or some other portion of the person or clothes to the mouth." Concededly a person is affected with typhoid some weeks before the disease develops. The plaintiff here resided three miles distant from his place of employment and traveled to and from his work upon the street car. To prove the time when he was attacked with typhoid, then find every individual who traveled on the same car with him and establish by each one of them that he or she was free from the disease even to his or her clothing is impossible. Again the evidence disclosed that typhoid fever was caused by sources unknown to medical science. If the word of the rule stated is to prevail plaintiff would be required to eliminate sources which had not yet been determined or ascertained. I do not believe the rule stated to be as inflexible as claimed for. If two or more possible causes exist, for only one of which a defendant may be liable, and a party injured establishes facts from which it can be said with reasonable certainty that the direct cause of the injury was the one for which the defendant was liable the party has complied with the spirit of the rule.

The plaintiff was employed in the immediate locality where the water was contaminated. He drank the water daily. The consumption of contaminated water is a very

frequent cause of typhoid fever. In the locality there were a large number of cases of typhoid fever and near to sixty individuals who drank the water and had suffered from typhoid fever in that neighborhood appeared as witnesses on behalf of plaintiff. The plaintiff gave evidence of his habits, his home surroundings and his method of living, and the medical testimony indicated that his illness was caused by drinking contaminated water. Without reiteration of the facts disclosed on the trial I do not believe that the case on the part of plaintiff was so lacking in proof as matter of law that his complaint should be dismissed. On the contrary the most favorable inferences deducible from the plaintiff were such as would justify a submission of the facts to a jury as to the reasonable inferences to be drawn therefrom, and a verdict rendered thereon for either party would rest not in conjecture but upon reasonable possibilities.

The judgment should be reversed and a new trial granted, costs to abide the event.

CARDOZO, POUND and ANDREWS, JJ., concur; HISCOCK, Ch. J., CHASE and McLAUGHLIN, JJ., dissent.

Judgment reversed, etc.