STANLEY BOGUSKI, ADMR. *v.* CITY OF WINOOSKI.

October Term, 1936.

Present: POWERS, C. J., SLACK, MOULTON and SHERBURNE, JJ., and CLEARY, Supr. J.

Opinion filed November 4, 1936.

*Russell F. Niquette* and *J. A. McNamara* for the defendant.

*A. Pearley Feen* and *Louis Lisman* for the plaintiff.

POWERS, C. J. Joseph Boguski, a young man seventeen years old, lived with his parents at 65 West Street in the southwestern part of the city of Winooski. He worked in the dye department of the American Woolen Company's mill, which was situated on the bank of the Winooski River in the same section of the city. On or about January 15, 1934, Joseph became ill and left his work at the mill. He called Doctor Sparhawk on January 24, who took charge of the case, and sought the nature of his ailment. On January 29, by use of Widol test, it was definitely determined that the patient was suffering from typhoid fever. Nurses were procured, Doctor Beecher was called in consultation, but in spite of it all, the boy died on March 1, 1934.

The plaintiff, as administrator of Joseph's estate, brought this suit against the city, claiming that the typhoid came from drinking the water of the city system, which, through the negligence of the city, had become contaminated as hereinafter stated. The plaintiff had judgment below on a verdict rendered in his favor. The defendant excepted.

The following facts were conceded or within the tendency of the evidence when read in a light favorable to the plaintiff:

Many years before the time here in question, the Woolen Company provided itself with a water system to supply it with water for manufacturing purposes and for fire protection. Its system consisted of a 100,000-gallon tank mounted on a 125-foot tower, and a pump installed in the mill, together with pipes, valves, and necessary equipment. By means of the pump, the waters of Winooski River were forced up into the tank, from which they flowed back into the mill as required. This system was in use long before the charter of the city of Winooski was granted. The village of Winooski had, at that time, a water system of its own, which was used for domestic and fire purposes. But its pressure was not adequate for fighting extensive fires, and to supplement the village system, the mill company's supply pipe was equipped with a by-pass with a P I V valve in it. This equipment was so installed that by opening this valve the river water would be forced into the mains of the village system. When this was closed a check valve held back the water from the river and prevented it from entering the village pipes. The purpose of it all was to enable the village to secure added pressure on its mains in case of an unusual fire. It was infre-

quently availed of by the village, but remained there for use if needed. Later on, after the city took over the village system, a pump was installed at the reservoir to force the water into the mains, and still later, a modern automotive booster pump was added to the city's fire-fighting equipment. So it came to pass some years ago that this mill company system, now owned by the city as we understand the record, was not, and is not now, needed by the city for fire protection. But it is still in use by the mill company, and the by-pass and valve remained in place until removed as hereinafter stated.

About the time Joseph Boguski was taken sick, there were many cases of intestinal disorders in the southwestern part of the city and several other cases of typhoid fever there. All of these cases were in houses supplied with city water. One Arthur Barry was in charge of the city water system during all the time here material. Shortly after December 22, 1933, he discovered that the meter located at the foot of Mayo Street and measuring the water supplied by the city to the woolen mill had not been read. He sent his assistant, Sullivan, down to check this meter. Sullivan returned from this errand and reported that he found the meter running backwards and the valve in the by-pass open, which unquestionably established the fact that the river water was passing through the by-pass into the mains carrying the city water supplied and used for domestic purposes. Sullivan caused the valve to be closed. Shortly after this, the State board of health ordered the by-pass removed, and this was done.

At the time it was discovered that the valve in the by-pass was open, the city meters were regularly read at three-month intervals. On September 23, 1933, the reading of the Mayo Street meter was 3108380. No December reading was recorded. The April, 1934, reading was 3025900. A test of the water taken from a faucet in a restaurant at 29 Main Street, which is on the lower level of the city, was made by Professor Moat, chemist of the State board of health, which disclosed the presence of sewage contamination, and contained bacilli coli. Other tests of the water from the woolen mill system showed like contamination and that it was unfit for drinking purposes, though that taken from the higher levels of the city showed no such condition.

It is not surprising that the river water was polluted in this way, as it appeared that practically all the sewage from the

towns from Barre to Winooski went into the Winooski River, including 20 percent of the sewage of the city of Winooski, which was discharged a short distance above the Woolen Company's intake.

The tests of the water did not disclose the presence of the typhoid bacillus. The evidence was that typhoid is a specific disease, that it is caused only by taking into the stomach this particular baccillus. But the tests did disclose the presence in the water of the bacilli coli which cause intestinal disturbances like those prevalent in the southwestern part of the city as stated above. And there was evidence to the effect that these typhoid bacilli were usually associated with sewage pollution and that the former were to be expected where the bacilli coli were found. There was evidence tending to exclude other sources of the infection, such as milk, fruit, and shell-fish; and there was no evidence to show that young Boguski could have been infected thereby.

When Doctor Beecher was on the stand, it was conceded that he was qualified to speak as an expert, and the plaintiff asked him a long hypothetical question which embodied the facts which the plaintiff claimed his evidence tended to establish, and the witness was asked if, upon those facts assumed to be true, he had an opinion of the source of Joseph's disease. The doctor replied that he had. Thereupon, he was asked to state that opinion. To this the defendant objected. The basis of this objection was that a reliable opinion could not be predicated upon the facts set forth in the question, because, there being no evidence that the typhoid bacillus was deposited in the Winooski River, the reply would be reached by basing one inference upon another which is not permissible; that one fact assumed was that there was an active carrier somewhere up the river; that another was that his excrement passed into the river; another, that the typhoid bacilli contained therein lived long enough to pass to and through the mill system into the city system; and that none of these facts were supported by the evidence. The objection was overruled and the defendant excepted. The doctor replied that, in his opinion, Joseph Boguski died from drinking water polluted with typhoid bacilli. This was all Doctor Beecher was allowed to say as an expert. It is apparent that counsel for the defendant expected that the expert was going to testify that, in his opinion, young Boguski died from drinking the city water

polluted by river water, and that he specified his objection on that expectation. But the witness did not attempt to say where the water came from that caused the trouble. It might be enough for us to say that, for this reason, the objection was properly overruled, or at least that the answer was harmless. But as it will be necessary to cover the matter later when we take up the next exception, we may as well say here that it would be enough if the evidence, fairly considered, convinced the jury to the extent required by the law that Joseph Boguski's typhoid actually resulted from drinking the water of Winooski River at his home. The previous facts assumed in the question and pointed out in the objection would be established without further proof. The typhoid bacillus could not exist in the river water he drank, unless those facts existed. That was the evidence.

The defendant at the close of the evidence, moved for a directed verdict on the ground that there was no evidence that any typhoid bacilli entered the city water system from the mill system and that the decedent's death resulted from drinking such water. And again the defendant insisted upon the rule that the jury could not predicate one inference upon another. This motion was overruled and the defendant excepted. As we have seen, this exception is closely related to the preceding one; but under it, we must further examine the record to see if there is any evidence fairly connecting the river water with the boy's illness. For the purposes of this motion we must take as established all facts favoring the plaintiff which the evidence fairly and reasonably tended to show. *Ryder* v. *Vt. Last Block Co.,* 91 Vt. 158, 164, 99 Atl. 733. Applying this rule to the evidence, we find: That the river water was carried into the city mains, is established; that this boy drank water from the city system, is established; that the river water was polluted with bacilli coli, is established; that typhoid bacilli are to be expected where bacilli coli are found, is established; that neither milk, fruit, or shellfish could have caused this infection, is established; that at least seven of the other cases of typhoid in the southwestern part of the city could have been caused by drinking the polluted water of the city system, is established; that the water in the higher levels of the city was free from pollution, is established.

Where did this infection come from?

No absolutely positive answer to this question can be given. No such answer is required by the law. In the very

nature of things, no direct proof of the source of this infection can be produced. Direct proof is not necessary. Circumstantial evidence may be resorted to, though the case is a civil one. Stephen's Dig. Ev. (Beers ed.) 7. And such evidence will be sufficient to justify the verdict below, if there can be drawn therefrom a rational inference that the city water, polluted by that from the river, was the source of the infection. *Hatch* v. *Daniels,* 96 Vt. 89, 92, 117 Atl. 105. There must be created in the minds of the jurors something more, of course, than a possibility, suspicion, or surmise of this fact, *Perkins* v. *Vt. Hydro-Electric Corp.,* 106 Vt. 367, 399, 177 Atl. 631, but the requirements of the law are satisfied if the existence of this fact is made the more probable hypothesis, when considered with reference to the possibility of other hypotheses. *Wellman* v. *Wales,* 98 Vt. 437, 440, 441, 129 Atl. 317. Nor is the reasoning to be employed in such cases necessarily that of cultivated and practiced minds; it is that of ordinarily intelligent understanding. Burrill, Circumstantial Evid. 24.

■ That the jury was fully justified in concluding that polluted water was the cause of the death of Joseph Boguski, cannot be disputed. The question here in issue becomes a close one, only when we have to say whether enough appears in the record to charge the Winooski River with the responsibility for the pollution. It seems clear to us that the jury was well justified in its inference that the river was the responsible agency. Not only was the inference a logical one, but it seems difficult to see how any other could have been drawn from the facts disclosed.

■ In this connection, the defendant again argues that this result could be reached only by piling one inference upon another. But as shown above, the only *fact* not shown by the evidence is that the bacillus of typhoid existed in the river water. But this fact is inferable from the epidemic which occurred in the lower levels of the city which the evidence tends to show could not have resulted from any other attendant cause. What the defendant characterizes as successive questions are really parts of a single question. See *Wellman* v. *Wales,* 98 Vt. 437, 441, 129 Atl. 317.

That it was not necessary for the plaintiff to present direct evidence of the presence of typhoid bacilli in the river water, and that their presence there is inferable from the facts in evidence, are well shown by the cases cited by the plaintiff. *Hayes*

v. *Torrington Water Co.*, 88 Conn. 609, 92 Atl. 406, is much in point. It was a suit to recover damages for negligence in safeguarding a domestic water supply. It was shown that a private water company supplied the town of Torrington with water for domestic purposes. One source of its supply was Crystal Lake, the other was the Hart Brook. The plaintiff, a customer, used the Crystal Lake water, and he, and others using that water, became stricken with typhoid fever. The presence of bacilli coli was found in the Crystal Lake water, but no typhoid bacilli were found. The presence of the bacilli coli was said to indicate the possibility that the water was infected with typhoid germs also. In other respects the evidence was much like that here. The court held that it could not say "that the jury might not reasonably have inferred that the plaintiff contracted typhoid fever from drinking the Crystal Lake water."

*Jones* v. *Mt. Holly Water Co.*, 87 N. J. Law, 106, 93 Atl. 861, 862, is directly in point. It was an action for damages for the sickness of the plaintiff's children alleged to have been caused by drinking the water supplied by the defendant for that purpose. The evidence was strikingly like that in the record before us. There, as here, it was claimed that no recovery could be had because it was not directly shown that typhoid bacilli were in the water, and that, therefore, there was no tenable ground for imputing the infection to the drinking water. The court declined to commend this position, saying:

"There was proof to the effect that for a long period of time before the outbreak of the typhoid fever epidemic, there was discharged into the sources of the defendant's water supply large quantities of fecal and vegetable matter, which the scientific experts testify are indicative of the presence of the bacilli coli, and which in turn indicate the presence of typhoid germs, but not necessarily so. And where there are bacilli coli in any considerable quantity there is a probability of the presence of the typhoid fever germ. * * * From his [the defendant's president] statements it appears that bacilli coli were found in the tests made of the water after going through the filtration plant of the defendant company. The plaintiff was not legally required to prove by positive testimony and with absolute certainty that the drinking of the water was the cause of the typhoid fever.

The plaintiff satisfied the burden which the law imposed upon him by proving such facts and circumstances from which

it was made to reasonably appear that the drinking of the water was the probable efficient cause of the typhoid fever.''

This last paragraph is quoted and approved in *Penn. Railroad Co.* v. *Lincoln Trust Co.*, 91 Ind. App. 28, 167 N. E. 721, 726, 170 N. E. 92, which was another case very similar to the case in hand. There two water systems were joined by a by-pass equipped with a valve and check valve, the function of the latter being to prevent the river water used by the owner of one of the systems from entering the pipes of the other owner, the city of Fort Wayne. The check valve became worn and leaky, the valve in the by-pass was opened and the polluted river water was forced into the city pipes. An epidemic of typhoid followed. The administrator of a victim of typhoid recovered a judgment in the lower court against the city and the other owner and this judgment was affirmed. *Hamilton* v. *Madison Water Co.*, 116 Me. 157, 100 Atl. 659, 661, Ann. Cas. 1918D, 853, also quotes and approves the rule regarding the sufficiency of the proof of the source of the typhoid infection as laid down in *Jones* v. *Mt. Holly Water Co., supra.*

 The defendant says that the by-pass with its valves was installed and maintained solely for fire-fighting purposes, and so it stood like a hydrant as a part of the city's governmental property, for the negligent handling of which the city could not be held liable, any more than the defendant could be in *Morgan* v. *Village of Stowe*, 92 Vt. 338, 104 Atl. 339, L. R. A. 1918F, 1000. The trouble with this argument is that the negligence here charged did not arise from the use of the by-pass for fire protection. That part of the defendant's water business which consisted of supplying its inhabitants with water for domestic purposes was private in character, and, for the negligent handling of it, the city is held to the same responsibility as an individual or private corporation. *Welch* v. *Village of Rutland*, 56 Vt. 228, 235, 48 A. R. 762; *Wilkins* v. *Village of Rutland*, 61 Vt. 336, 339, 17 Atl. 735; *Morgan* v. *Village of Stowe*, 92 Vt. 338, 341, 104 Atl. 339, L. R. A. 1918F, 1000. While the city was not a guarantor of the purity of its water supply, it was bound by the law to use reasonable care to that end. If it failed of the discharge of this obligation, it was liable for the damages caused thereby to a customer, who without contributory fault was injured in his person or property. When the village installed the by-pass or allowed it to be installed,

it assumed the obligation of exercising due care to prevent it from causing the contamination of its domestic supply. The city succeeded to this obligation. The danger was apparent. If the valve in the by-pass was left open, or allowed to rust out or otherwise to become leaky, a most dangerous condition might result. If the polluted water of the river was allowed to enter the city pipes, it would rise therein as high as the pressure would force it, and the health of the whole city would be threatened. The simplest rules of public policy as well as the established law of the subject required the city to keep reasonable watch over its apparatus there. This proposition is well supported by the case of *Stubbs* v. *City of Rochester*, 226 N. Y. 516, 124 N. E. 137, 5 A. L. R. 1396. There the city had two sources of water supply. The one for domestic uses was Hemlock Lake and was known as the Hemlock system; the one used for fire purposes was known as the Holly system, which was supplied with water from the Genesee River. Separate distributing pipes were maintained, but these were joined in a manner not materially different than the by-pass arrangement here. A Y-shaped pipe was installed, one branch of which was connected with the Hemlock system and the other with the Holly system. Gates were placed in each of the pipes, either or both of which could be used to operate certain lift bridges over the Erie Canal. A check valve protected the Hemlock system from the entrance of the water of the Holly system. An epidemic of typhoid fever having broken out, it was discovered that the check-valve in the Hemlock system pipe was missing and that the two systems were commingling. The plaintiff contracted typhoid, and sued the city for negligence. A judgment for the defendant was reversed, by a divided court to be sure, but we think the decision is sound.

Another interesting and instructive case on this phase of the case in hand is *Roscoe* v. *Everett*, 136 Wash. 295, 239 Pac. 831, 833. That was an action for damages for the death of a man who, it was claimed, died from the effects of drinking polluted water furnished by the city of Everett. It appeared that the city water system was connected with the system of the Eclipse Mill Company which was supplied with water pumped from the Snohomish River, a polluted stream. This connection was made by a by-pass, which was equipped with a valve, and there were check valves which kept the river out of the city pipes when the valve was closed. But when the valve in the by-pass was open,

the river water entered the city pipes and rose therein until stopped by the city pressure. An epidemic of typhoid fever having broken out in the city, an investigation disclosed that the valve in the by-pass was open and the water of the river was entering the city pipes, and owing to a lack of pressure therein, due to a temporary cause, the river water rose in the city system to a greater height than it otherwise would have. In affirming a judgment for the plaintiff, the court said, among other things: "In this case, the city permitted water taken from a point close to where city sewers emptied into the river to be pumped into a line which was physically connected with all the users in the district. Nothing but the closed gate valve could prevent the polluted water reaching the consumers. The ease with which the valve could be sealed or the by-pass removed, and the imminent danger to be apprehended by failure so to do, are strong factors in the question of the city's negligence. * * * * The court did not err in submitting this question to the jury."

All that the court said in that case should be said in this one. The question of the defendant's negligence was so plainly for the jury that no further comment is called for.

*Judgment affirmed.*