[Civ. No. 22599. Second Dist., Div. One. May 26, 1958.]

EVA JANE WARDROP, a Minor, etc., et al., Appellants, v. CITY OF MANHATTAN BEACH et al., Defendants; FRANK A. BARSO et al., Respondents.

Gray, Glass & Allen, Martin, Hahn & Camusi, William P. Camusi and Richard F. Scott for Appellants.

Parker, Stanbury, Reese & McGee and White McGee, Jr., for Respondents.

WHITE, P. J.—Plaintiffs instituted this action against defendants to recover damages for crippling injuries sustained by minor plaintiff Eva Jane Wardrop, in contracting bulbar poliomyelitis from fecally contaminated waters allegedly contained in an open sump in the vicinity of plaintiffs' home. Prior to trial, the action was dismissed as to all defendants except Harry Barron, Frank A. Barso doing business as B & B Homes, a copartnership, and Roy Baker.

The complaint contains six causes of action, the first three of which are on behalf of minor plaintiff, and the first of which alleges the existence of a nuisance occasioned by the mere maintenance of the aforesaid sump. The second alleges a trespass by the intentional pumping of the sump water into the backyard of plaintiffs' home where, it is alleged, the minor plaintiff came into direct contact with said water. The third cause of action is predicated on the alleged negligent maintenance of the sump and its contents.

The first, second and third cause of action on behalf of the adult plaintiffs, parents of the minor plaintiff, are based, respectively, on the three causes of action brought on behalf of the minor plaintiff, and by them, the adult plaintiffs seek to recover special damages for hospital and medical expenses incurred for the care of minor plaintiff.

At the outset of the trial the first cause of action on behalf

of all plaintiffs, founded on a claimed nuisance by reason of the mere maintenance of the sump, was dismissed.

The cause proceeded to trial before a jury. Upon conclusion of plaintiffs' case, the court granted a motion for nonsuit as to plaintiffs' third cause of action, based on negligence. A similar motion by defendants as to plaintiffs' second cause of action (trespass by the intentional pumping of the sump water into the backyard of plaintiffs' home) was denied, and when both sides had rested their case, the court denied defendants' motion for a directed verdict as to the second cause of action.

The jury returned verdicts in favor of the minor plaintiff in the amount of $54,000, and in favor of the adult plaintiffs, in the sum of $12,530.49. Judgment on the verdicts was accordingly entered. Thereafter, defendants filed written notice of motion for judgment notwithstanding the verdict (alternative form under Code Civ. Proc., §§ 629 and 659), and defendants also filed their notice of intention to move for a new trial. The court granted the motion for judgment notwithstanding the verdict. As to the motion for a new trial, the minute order thereon reads: "No action is taken by the Court on Defendants' Motion for New Trial herein." The trial judge stated: "I am going to say this, counsel. I am going to bring an end to this lawsuit. If the Supreme Court holds that there is sufficient evidence to take this case and uphold the verdict, then I am going to go along with the jury. So I will not make any order granting the motion for new trial, if the order non obstante is reversed. If the Supreme Court holds that the evidence is sufficient under this record to take the case to the jury, then I am going to hold that the jury found properly. In my opinion, the record on proximate cause is devoid of evidence, for the reasons I have stated, but if my reasoning is wrong, then the jurors' verdict is correct."

Judgment vacating the former judgment entered on the verdict and granting judgment notwithstanding the verdict was thereupon entered. From such judgment plaintiffs prosecute this appeal.

Concerning the factual background surrounding this litigation the record reflects that plaintiffs George C. Wardrop and Ebell Wardrop are husband and wife and the parents of the minor plaintiff Eva Jane Wardrop and three other children ranging in age between 3 and 8 years. In June, 1954, the minor plaintiff herein, then within a month of her fourth

birthday, was stricken with poliomyelitis. Plaintiff father is a welder by trade. In March, 1954, he, with his family established their home at 819 Meadows Avenue, Manhattan Beach, in Los Angeles County. They rented the home on a month-to-month tenancy from defendants Frank A. Barso and Harry Barron, doing business as B & B Homes. These defendants, doing business as a copartnership, were engaged in the business of constructing tract houses in the Manhattan Beach area. The aforesaid house rented and occupied by plaintiffs, was one of the first constructed by B & B Homes. During the period here in question, defendant Roy Baker was employed as superintendent for B & B Homes, which copartnership had been in the building business since 1937 and continued to construct houses in the Manhattan Beach area until the latter part of 1954 or early in 1955. (Unless otherwise stated herein, use of the words "defendants" or "appellants" will indicate Frank A. Barso, and Harry Barron doing business under the name and style of B & B Homes.)

Approximately in February, 1953, defendants signed a bond with the city of Manhattan Beach, under the terms of which they agreed to excavate a sump at the rear of the property rented from them and occupied by plaintiffs, which excavation was to be 150 feet long, 50 feet wide and 6 feet deep. The sump was required as a condition to the construction by defendants of a tract of 65 homes just east of Meadows Avenue and across the street from the property rented by plaintiffs. The sump is located one and one-half miles from the ocean.

The sump was constructed in the lowest elevation in the neighborhood. From a survey of the area it is apparent that there is a bowl or saucerlike condition with the sump located in the lowest point thereof. This saucer-shaped area all drains into the lowest area where the sump is located. There was evidence that there was surface drainage from the surrounding area into the sump and that a considerable portion of the area surrounding the 65 homes naturally drained into the sump. All of the 65 houses were equipped with cesspools and there were no sewers in the area. Actual construction of the sump was commenced about December, 1953. It seems fair to state that defendants were required to construct the sump for the purpose of catching all waters in the drainage area, including the increased accumulation of water which would be caused by the construction of the aforesaid 65 homes. The theory of the sump was thus described by Frederick C. Butcher, City

Engineer of the City of Manhattan Beach: (1) The sump would have a capacity to contain a certain amount of water and prevent the same from encroaching on and damaging private property in the vicinity. (2) In digging through the overlayer of impervious soil it was felt that a more sandy soil would be reached, thus permitting more adequate drainage and percolation of water from the area. The sump was designed, stated Mr. Butcher, with the idea that it would reach soil coarse enough for water to seep away; that this was the original intention. But, for reasons not necessary here to narrate, the sump did not function as had been planned and on May 24, 1954, City Engineer Butcher advised defendants by letter that they would have to pump the water out of the sump and complete the installation of seepage pits; that the water in the sump could not evaporate or soak into the ground and was becoming stagnant; that complaints had been made to Mr. Butcher that the water was creating a stagnant odor and drawing flies and mosquitoes. Mr. Butcher concluded his letter with the statement: "It is earnestly hoped that you will be able to wind this work up so that we can accept the improvements and therefore release you from your bond."

The seepage pits could not be installed until the water had been drained out of the sump. After receiving the letter of May 24, 1954, from the city engineer, defendant Barso called the former and asked what could be done. Barso spoke to defendants Barron and Baker concerning this problem. Mr. Baker advised Mr. Barso that he, Baker, would pump the sump water out into the surrounding ground and Mr. Barso advised Mr. Baker to proceed to do so.

Plaintiff Mrs. Wardrop first observed Mr. Baker pumping the water from the sump into her backyard at approximately 8 a. m., Monday morning, June 14, 1954. The pumping went on for five days, from approximately 8 o'clock in the morning to 4:30 in the afternoon. Mrs. Wardrop asked Mr. Baker to stop pumping the water into her backyard, but Mr. Baker replied he had his orders. Mr. Wardrop also tried to stop the pumping of the water into the backyard with rather expressive words, but likewise failed. He spoke with defendant Barron the evening of June 14, and warned Mr. Barron that he was endangering the lives of the Wardrop children. Mr. Wardrop had advised Mr. Barron in the latter part of April that it would be wise to put fish in the sump to purify the water, and Mr. Wardrop did in fact put some catfish into the sump water thereafter. Baker testified

that he was attempting to channel the water from the back-yard to the front of the house where a seepage pit had been installed on the southerly side of the driveway. This seepage pit in the front of the yard was approximately 30 feet from the cesspool which was located in the front of plaintiffs Wardrop's house.

When the pumping operations ceased, plaintiffs Wardrop's yard contained puddles of water, mud, or both, for a period of 10 days. After the pumping stopped, the Wardrop yard was filled with green blow flies. These blow flies also managed to get into the house in considerable numbers and continued to exist on the premises until after minor plaintiff Eva Jane went to the hospital with bulbar poliomyelitis. (Eva Jane went to the hospital on August 1, 1954.) There had been no blow flies on the premises prior to the time of the pumping. Adult plaintiffs testified they did everything possible to elimi-nate the blow flies and were finally successful after Eva Jane was taken to the hospital, by using a large spray gun with special powder recommended by the Health Department. Dur-ing and after the pumping, the yard of the Wardrop home was littered with bits of green substance and other muck.

Defendant Baker testified that he noticed debris in the water when he was pumping it out. City Engineer Butcher also testified that he inspected the water prior to writing his letter of May 24, 1954, and that the water was in a stag-nant condition and had a greenish, oily film on the surface and greenish moss. From the time the Wardrops moved in, March, 1954, to the time of pumping in June, Mrs. Wardrop observed that the sump water was dirty, with bits of debris, and green scum on the surface. She also observed that the sump had a ''sour'' odor.

Donald Marshall, police officer for the City of Manhattan Beach, to whom Mrs. Wardrop complained, testified that he observed the pumping on one occasion, that the water from the sump was very dirty, that there were foreign objects floating in the water and that there was an ''unpleasant odor.'' He observed water on the front porch of the Wardrop home. Mr. Marshall was on the premises on the 16th day of June, 1954. He testified on cross-examination that he observed toilet paper in the sump water in the backyard of the Wardrop home and all kinds of small particles of rubbish. The water was never disinfected by defendants at any time.

As heretofore noted, the area here in question was serviced

by cesspools and there were no sewers. There is in the record evidence concerning the overflowing of these cesspools. James S. Parkinson who lived four houses west of plaintiffs' home testified that rains interfered with completion of the sump. That he saw the sump water later being pumped out and then in the backyard of plaintiffs' home. This witness further testified that while the sump was being dug and its completion interrupted by the rains his neighbor's cesspool "looked like the cesspool had blowed up and water had come up fully six feet high." "It spouted up like a geyser." His neighbor's yard was "all flooded around there at the time." The offensive odor was very strong at that time and Mr. Parkinson complained to the city authorities. Mr. Parkinson stated that his backyard has flooded every winter he has lived there. During the rainy season the cesspool could not hold any more water and drained down toward the lower land.

During the five days in which the sump water was pumped into the Wardrop backyard, Mrs. Wardrop kept the children in the house. *However, on the third day of pumping operations, June 16, 1954, the minor plaintiff, Eva Jane Wardrop, ran out of the house to greet her father coming home from work, and she fell in the muddy water which got into her nose, mouth, eyes and hair.* During this period none of the Wardrop children were going to school, as they were of a preschool age. After the pumping operation ceased Mrs. Wardrop had a difficult time keeping the four children in the house. The children were restless from being confined and the mother had two small babies to take care of so she could not watch the two older children all the time. Eva Jane got out into the backyard and into the mud caused by the pumping of the water. Mrs. Wardrop had to change Eva Jane's dress three or four times a day because of the muddy condition of the yard.

The minor plaintiff Eva Jane had never been to the market nor to the beach. The only place the children were taken was to the home of Mrs. Wardrop's mother-in-law and father-in-law in the City of Redondo Beach. There were several children who lived in the neighborhood of 819 Meadows. Also, Mrs. Wardrop had never taken her children to a motion picture theatre.

On the subject of poliomyelitis, plaintiffs called two qualified expert witnesses, Dr. A. F. Rasmussen and Dr. Milton Rosenthal. Defendants called Dr. Albert G. Bower. We re-

gard the following as a fair epitome of the testimony given by plaintiffs' expert witnesses. The germ connected with poliomyelitis is called the virus of poliomyelitis. It affects human beings only. The virus grows only in the human body. It grows all along the digestive tract, from the mouth all the way to the bowel. The two major areas where it proliferates in large amounts are in the tonsils and in the walls of the small bowel. The virus usually enters through the mouth and proliferates in the mouth and tonsils and persists there in fairly large quantities for a few days. The virus is usually found in the mouth and tonsils for only two or three days and then the virus goes rapidly down to the stomach and to the bowel and proliferates in the small bowel and it will persist or exist there for several days, in most individuals for a week or 10 days but sometimes longer, and even occasionally for several weeks and months. In fact, in one or two documented cases the virus has persisted in the bowel for a period in excess of a year. Dr. Rasmussen testified that he treated one patient in whom the virus persisted in the bowel in excess of six weeks.

The virus then accumulates in the large bowel along with other waste products of digestion, and is discharged by the body through the bowel waste; and also during the early phase of the infection, the virus is discharged from secretions of the mouth.

There are so many virus in the bowel that the raw sewage of any large city during the late summer is likely to contain large amounts of virus, so much that one teaspoonful would contain four to five billion microbes of virus particles. *The bowel wastes are by far the largest source of the virus.* Experimentation has shown that flies, blow flies in particular, carry the virus and can infect food. However, the importance of flies in the transmission of the disease is still a matter of conjecture. *Dr. Bower testified that the virus is found in sewage, that is from excretions of the human body in sewage systems or in outhouses or toilets.* Dr. Bower agrees that it is much easier to capture the virus from the human stool rather than a person's throat because it remains in the throat a relatively short time, *but it may be found in the stool for many weeks and in a few cases many months.* Dr. Bower stated that he "could see how it would be possible" for the virus to travel several miles in a stream of water but that he could not "speak from any knowledge." *He also*

*testified that the poliomyelitis virus exist at times in contaminated water supplies and sewage.* Dr. Bower stated he had particular reference to rivers, lakes, and the ocean where sewage outfalls exist and grossly contaminate the water.

The experiments of some scientists have shown that *the virus exists for weeks, at least, in cesspools, can be found in sewage, and will persist in storage sewage water.* Dr. Rosenthal testified that the virus can live for as long as seven months. As to the length of life of the virus in cesspools or sewers, Dr. Bower testified, "I would expect it to live longer—I say I would expect it, but that is based on what I know of the organism, and what I know of it's life habits." In his book entitled, "Communicable Diseases for Nurses," Dr. Bower states that the polio virus "will survive in the body secretions at ordinary temperatures outside the body for long periods of time." He also explained that the stool and the urine are the principal secretions from the body.

As to the incubation period of the virus, Dr. Bower testified that in many textbooks such period has been stated to vary from two to 35 days; that his personal opinion is "10 to 12 days at the outside." By incubation period is meant the period of time dating from the time the virus entered the mouth, to the time of the onset of the first illness. From the first sign of illness to the time paralysis develops, may involve a further period as long as 25 days. Dr. Bower explained that a child in the biphasic type may have a headache, backache and fever and be sick from 2 to 4 days; then the child is well from 2 to 18 days, and then has the symptoms all over again accompanied by weakness or paralysis and it may be fully 25 days between the time the first symptom appeared until the time the patient is paralyzed.

As to the symptoms of the minor plaintiff Eva Jane Wardrop there is testimony in the record that prior to the time of the pumping, the child enjoyed good health. Her mother noticed that on July 4, 1954, Eva, who was present at a fireworks display, which she had looked forward to with keen anticipation, complained of being very tired and expressed a desire to be taken home. From the time the child arrived home, her mother observed a worsening of her health. Eva suffered a loss of energy and of appetite. On July 24th she made no effort to get out of bed. Her temperature was up and she complained of pain in her legs, The mother first noticed fever in Eva Jane around July 11. The child's temperature went up and down and back to normal. During this

time, the child complained of headaches, not being able to sleep, and not feeling hungry. She ran a fever as the month of July progressed and she vomited and had diarrhea. On or about July 24, Eva Jane Wardrop became noticeably worse. The child had no strength at all. The father, George C. Wardrop, first noticed Eva Jane's sickness on the 4th day of July. He had planned quite an event for her that evening. Also, on her birthday, on July 16th, the child refused her birthday cake. Eva Jane Wardrop was seen by Dr. Julius Strauss, Dr. Lorenz and Dr. Greenhut. She was taken to Dr. Strauss approximately July 11th. Dr. Lorenz saw the child on July 15, 24, and 31. She last saw Dr. Lorenz on July 31, and then the child was taken to Dr. Greenhut at 4 a. m. on August 1st.

The other Wardrop children were taken ill and had the same symptoms as Eva Jane, although none of them had any permanent ill effects. The other children were suffering from vomiting and febrile temperatures. Little Nancy Jo had temperature and was "fussing" on July 11.

Since no claim is made on this appeal that the damages awarded are excessive, we deem it unnecessary to narrate the condition of the minor plaintiff at the time of the trial nor to detail testimony as to prognosis. It will suffice to say that the child was taken to the Los Angeles County General Hospital on August 1, 1954. Her case was diagnosed as that of bulbar poliomyelitis. She remained at this hosiptal for approximately five weeks. She was placed in an iron lung. She was then taken to Rancho Los Amigos and was there for approximately one and one-half years. After staying there for approximately one year, she was able to go home on weekend passes.

At the time of trial in March, 1957, almost three years from the time of her infection, her whole body from the neck to her knees and legs, was enclosed in a cast. Each leg was in a separate cast. The child could not bend at the waist. She has had three surgical operations and there are three contemplated surgical procedures. With reference to her future the testimony was that the possibility of return of muscle function is slight after two and one-half years. "The main thing is to give the child a stable trunk." If this can be done she will be able to sit in a wheelchair. In order to walk, she will need braces from foot to hip and crutches for support. "It is possible that she would be able to stand and

to walk to some extent perhaps with this apparatus." The ability to walk will depend on the outcome of the future operations. It will be difficult for her to stand for any length of time.

We are not here concerned with a case wherein the appeal is taken from a judgment rendered by the duly constituted arbiter of the facts, or based upon conflicting evidence, but are confronted with an appeal taken after a jury verdict in favor of plaintiffs and wherein a judgment predicated thereon was set aside by the trial court and judgment ordered in favor of defendants notwithstanding the contrary verdict of the jury.

■ The rule governing the trial court when, as in the case at bar, it is confronted with a motion to set aside a judgment notwithstanding the verdict, is thus stated in *Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]. "The right of the trial court to set aside a verdict and enter a contrary judgment is absolutely the same as its right to grant a nonsuit (citations). ■ The court should, therefore, grant such a motion when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff." (See also *Estate of Green,* 25 Cal.2d 535, 546 [154 P.2d 692] ; *Hunt* v. *United Bank & Trust Co.,* 210 Cal. 108, 117 [291 P. 184] ; *Free* v. *Furr,* 140 Cal.App.2d 378, 381 [295 P.2d 134] ; *Martin* v. *Ideal Packing Co.,* 156 Cal.App.2d 232, 235 [319 P.2d 95].)

Recognizing this rule, respondent concedes that "The issue on this appeal is whether there was sufficient evidence of a causal connection between the acts of the defendants and the disease of poliomyelitis suffered by the minor plaintiff to sustain a finding in favor of the plaintiffs."

Respondents urge that the record is barren of any evidence distinguishing between the sump water and the conditions it created as transmitting agents and the many and various modes of transmission from other sources to the end of establishing a foundation for a reasonable belief that the former was probably responsible instead of the innumerable other sources. In other words, that under the evidence in this case it was just as probable that the minor plaintiff contracted poliomyelitis from a source other than the sump water. However, we do not regard the burden of proof resting upon plain-

tiffs to require demonstrable or direct proof that the polio virus was found in the sump water and that as a result thereof, the minor plaintiff's contact therewith infected her with the disease. ██ Plaintiffs satisfied the burden of proof which the law imposed upon them if they presented such facts and circumstances from which it could reasonably appear that the minor plaintiff's fall into the sump water and contact therewith was the probable efficient cause of her affliction. The cases of *Ritterbusch* v. *City of Pittsburg*, 205 Cal. 84 [269 P. 930, 61 A.L.R. 448], involved a situation wherein defendant city supplied water for drinking purposes from the New York Slough, an off-shoot of the San Joaquin River. The water taken from the slough passed through a chlorination plant, but the plant broke down for a 12-hour period and unchlorinated water passed into the city's water mains during this 12-hour period. Plaintiff's intestate succumbed. It was claimed that plaintiff's intestate's death was due to typhoid contracted from the drinking of the unchlorinated water. Defendant city argued that the infection of typhoid "might have had its origin in other sources such as the use of water from wells in various parts of the city . . . ." The court, however, at page 88, states that such an argument "creates at best but a conflict in the evidence as to the source of infection, and this evidence is weakened as to its inferences by the fact that while these other sources of water supply had existed for a considerable period of time prior to the month of June, 1920, no epidemic had resulted until the particular period following the pollution of the municipal water supply."

Before discussing the facts from which we believe the jury could reasonably conclude that the source of infection was from the sump water rather than from some other source, we feel impelled to further point out with reference to respondents' contention that the case of the minor appellant "as to causal connection rests only upon coincidence and speculation," that appellants were not required to prove by direct evidence the existence of polio virus in the sump water and that her illness was occasioned by her falling into it. As heretofore stated, all that appellants were required to do was to present evidence from which the jury could reasonably have inferred that the sump water was the probable cause of polio contracted by Eva Jane Wardrop.

Strikingly similar to the question now presented to us is the case of *McAllister* v. *Cosmopolitan Shipping Co.*, 169 F.2d 4, which involved an appeal from a general verdict after a jury

trial of an action by a seaman under the Jones Act (46 U.S. C.A. § 688) against the defendant for negligence in causing plaintiff to contract poliomyelitis while working on a vessel in Chinese waters. When the ship arrived in Shanghai, the crew was warned of an epidemic of poliomyelitis in that city and they were admonished not to associate with the Chinese while ashore and to take their meals only in certain places available to seamen. It appears that passengers and other people boarded the vessel at Shanghai, the latter for the purpose of performing stevedoring work. They used common toilet facilities and a common drinking fountain. Two Chinese cooks who came on the ship at Shanghai used the same cooking utensils and handled the same food as other cooks. No evidence was presented that any of these people boarding the vessel at Shanghai were actually infected with the virus of poliomyelitis. In affirming a judgment for $100,000, Mr. Justice Hand noted that the jury could properly find that plaintiff's infection was caused ''by conditions negligently permitted to exist on shipboard at that time . . . and which were conducive to polio.'' In the cited case the important issue was predicated on the claim of defendants that they were not liable if plaintiff had contracted the disease while frequently ashore during the month the ship was docked at Shanghai. Defendant contended that it was just as probable that plaintiff contracted polio while ashore and exposed to it. In rejecting this contention, the court, at page 7, said: ''The defendant argues however that plaintiff might have contracted polio when he took shore leave at Shanghai as he frequently did during that period. It is undoubtedly true that no one can be certain where he contracted the disease, but he had been warned by notices posted on the ship that there was danger of contracting polio in that port and to avoid associating with coolies when on shore and to eat his meals at American clubs available to seamen. This warning coupled with the fact that there was no evidence that the plaintiff did not give heed to it made it permissible for the jury to find that he became infected on shipboard due to negligence of the defendant rather than on shore.''

While this decision was reversed by the United States Supreme Court (*Cosmopolitan Shipping Co.* v. *McAllister*, 337 U.S. 783 [69 S.Ct. 1317, 93 L.Ed. 1692]), the ground of reversal was that the general agent could not be sued as the ''employer'' under the Jones Act since the United States was the employer.

In *County of Los Angeles* v. *Industrial Accident Commission*, 13 Cal.App.2d 69 [56 P.2d 577], a nurse employed at the Los Angeles General Hospital as a graduate student nurse consumed her meals with other nurses in what was known as the contagious diseases building and which dining room was used by nurses from the ear and nose clinic wherein treatment was accorded to polio patients. The afflicted nurse also worked three days in the ear and nose clinic where she was also exposed to polio, characterized in that case by medical testimony as a *"*most infectious and contagious*"* disease. In that case, as in the one at bar, the contention was advanced by the county, *"*that the finding of the Commission that the employee contracted poliomyelitis . . . in the course of and arising out of her employment is unsupported by substantial evidence and *is mere speculation and conjecture."* (Emphasis added.) In rejecting this argument it was said by this court, at page 73: *"*There was an abundance of evidence adduced before the commission upon which it could reasonably find that the employee's exposure to this contageous disease in the course of her employment resulted in her affliction." (See also *Industrial Commission* v. *Corwin Hospital*, 126 Colo. 358 [250 P.2d 135] ; *Ritterbusch* v. *City of Pittsburg*, *supra*.)

In *Stubbs* v. *City of Rochester*, 226 N.Y. 516 [124 N.E. 137, 5 A.L.R. 1396], plaintiff drank tap water and contracted typhoid fever. He offered evidence that dirty water from the Genessee River was entering the water lines, and that the water was *"*oily and of unusual appearance." The defense proved that typhoid fever could be due to drinking polluted water, eating raw fruits and vegetables fertilized by raw excrement, consumption of shell fish, infected milk and vegetables, personal contact with infected persons, and other causes known and unknown to medical authorities. Defendant argued that plaintiff must prove his injury was due in whole or in part to the cause for which it was responsible and that plaintiff should eliminate the other causes for which defendant was not responsible. The court rejected this contention, stating: *"*If the argument should prevail and the rule of law stated is not subject to any limitation, the present case illustrates the impossibility of a recovery in any case based upon like facts. One cause of the disease is stated by counsel to be 'personal contact with typhoid carriers . . . whereby bacilli are received and accidentally transferred by the hands or some other portion of the person or clothes to the mouth.' . . . To prove the time when he was attacked with typhoid

then find every individual who traveled on the same car with him, and establish by each one of them that he or she was free from the disease even to his or her clothing is impossible. . . . If two or more possible causes exist, for only one of which a defendant may be liable, and a party injured established facts from which it can be said with reasonable certainty that the direct cause of the injury was the one for which the defendant was liable, the party has complied with the spirit of the rule.''

For other cases establishing the rule that if the plaintiff is able to establish with *reasonable certainty* that the direct cause of injury was the one for which the defendant was liable, the jury will be permitted to say whether they are satisfied with the proof made, and in the case at bar, determine therefrom, that the source of minor appellant's infection was the polluted sump water, see *Hamilton* v. *Madison Water Co.*, 116 Me. 157 [100 A. 659, 660, Ann.Cas. 1918D 853]; *Boguski* v. *City of Winooski*, 108 Vt. 380 [187 A. 808, 811]; *Forbes* v. *City of Jamestown*, 212 App.Div. 332 [209 N.Y.S. 99, 102].

We find nothing in the cases cited by respondents that militates against what we have herein stated or the authorities relied upon by us.

■ It is true, as stated by respondents, that difficulty of proof will not serve as an excuse for substituting speculation for evidence, but in the instant case, to insist that appellants must establish by positive proof that the minor appellant's infection came from the sump water would be to require an impossibility. All that is required is that appellants present testimony from which the triers of fact could by reasonable inference, reach a conclusion to that effect (*McAllister* v. *Cosmopolitan Shipping Co.*, supra, p. 7; *County of Los Angeles* v. *Industrial Accident Commission*, supra, p. 73).

■ We are satisfied that from the evidence in the case now engaging our attention, the minor appellant coming into direct contact with fecal matter in the sump water was more likely to have become infected therefrom than from some type of indirect contact or infection. In the case at bar, there was evidence that the condition of the sump, the surrounding drainage area, the number of houses and cesspools remained unchanged between the time of the pumping of the water into appellants' backyard in June of 1954 and the time when tests were made of the sump water on August 8, 1955, showing that the sump water, into which the minor plaintiff fell, actually contained fecal matter. If, as respondents contend, there is no causal connection between the sump water and

the minor appellant's polio, why did she become infected shortly after her exposure to the particular sump water, which period of exposure coincides with the incubation period of poliomyelitis?

 Respondents' contention that the expert medical testimony was insufficient because no doctor testified that in his opinion this particular sump water was the infecting agent of Eva Jane's poliomyelitis is not borne out by the record because, as the trial judge stated during the argument on the motion for nonsuit, "Now, as I review the testimony of Dr. Rasmussen, he has in effect testified that that is a reasonable medical possibility. He did not apply it to this case, but taking his testimony as a whole, that is the effect of his testimony."

And as the court further observed, "If that opinion is merely the ultimate reasoning drawn from the medical facts that are established, it seems to me the Jury could draw that conclusion, and its duty is to draw that conclusion rather than the doctor."

 The evidentiary features of this case are herein set forth in detail, and it would unduly prolong this already lengthy opinion to here again narrate them. We are satisfied that the learned trial judge correctly epitomized the evidence, when, in denying the motion for nonsuit he said:

"The evidence shows that the defendants, in order to complete the performance of their contract for the construction of the sump, wilfully and intentionally pumped the water from the sump onto the land which was occupied in tenancy from month to month by the Wardrop family. . . .

"It shows that there was a source of contamination of that water with human fecal matter, as I have heretofore pointed out, by the rainfall, and also I think it is possible here to suppose—that it is reasonable to suppose that there was some subsurface flow of water from those cesspools, as shown by the growth of vegetation there. *It shows that this water—and this could be a finding by the jury—was contaminated with human fecal matter. It shows that human fecal matter often carries the polio virus, and that the polio virus is taken into the human system through the mouth; that this child fell into this water and got water in her face and in her mouth and in her nose,* as I remember the mother's testimony, and all over her clothing. . . .

"It shows that the child commenced about seven days after the fall into the water—I have this exact in my notes, but I

do not believe I need to refer to them now. The evidence shows that the child became listless about seven days after the fall, and there was a loss of appetite; and on July 4th, which was about eighteen days after the time she fell into the water, she had marked loss of strength. That shortly after that she started to have recurrent fever, and constantly lost strength until the symptoms of paralysis and the degenerative symptoms of polio appeared, and poliomyelitis was diagnosed on August 1st.

"Now, this takes two reasoning processes. You have the reasoning process by which the jury could find that there was fecal matter, and they could find that there was a reasonable probability that that matter contained the virus of poliomyelitis. And then they could reason back from the fact that she contracted it from the result to the cause, that she contracted it by the inducement into her mouth of the contaminated water.

"Therefore, it seems to me that, although sketchy, I cannot say that it is not a question of fact for the jury." (Emphasis added.)

Then, after pointing out that there are many other sources of infection and that some of them were just as reasonably probable as the pumping of the water from the sump into appellants' backyard, such as the fact that the minor appellant had been playing with children who came from a source of infection that was closer to the cesspools than the sump, the trial judge continued: "But under the law, where there are two or more probable sources, I do not believe I could take away from the jury the question as to whether or not there is a reasonable probability—and, after all, that is all the preponderance of the evidence means—that this was the source of infection." In answer to respondents' counsel that any medical expert "would have had to testify that there was a reasonable possibility that she (minor appellant) got the germ from her father, from her mother, from a child, from playing with other children," the trial judge correctly observed, "Oh, that is true, there is no doubt about that. That was brought out in the typhoid cases that were cited. . . . There is this evidence Mr. McGee: that, with the exception of playing with the neighborhood children, and there is no evidence that any of those children were afflicted with the disease, and there was no other source of exposure except the parents." The court then pointed out that under the evidence, on motion for nonsuit, the inference must be drawn

that the sump water actually contained the polio virus, and "we have to draw the further inference, which is one that I think under the evidence could be reasonably drawn, that this colon bacilli came from human rather than animal excrement. Whether or not the jury will draw that inference, I don't know."

All of the foregoing evidence and the inferences reasonably deducible therefrom were present at the time the motion for a nonsuit was properly denied, and also when with equal propriety, the motion for a directed verdict was denied. It is therefore, manifest to us that the case was properly submitted to the jury, and that under well established rules (*Card* v. *Boms, supra*, p. 202), the trial court erred in granting the motion for judgment notwithstanding the verdict.

The judgment is reversed and the cause remanded with directions to the court below to enter judgment in favor of the plaintiffs in accordance with the verdicts of the jury rendered in this action.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied June 23, 1958, and respondents' petition for a hearing by the Supreme Court was denied July 23, 1958. Schauer, J., was of the opinion that the petition should be granted.